# DOUGLAS, COMMISSIONER, VIRGINIA MARINE RESOURCES COMMISSION *v.* SEACOAST PRODUCTS, INC., ET AL.

No. 75–1255.   Argued January 17, 1977—Decided May 23, 1977

*James E. Moore,* Assistant Attorney General of Virginia, argued the cause for appellant. With him on the briefs were *Andrew P. Miller,* Attorney General, and *Anthony F. Troy* and *James E. Kulp,* Deputy Attorneys General.

*John J. Loflin, Jr.,* argued the cause for appellees. With him on the brief were *Thomas H. Willcox, Jr., James C. Howell,* and *Franklin G. Hunt.**

---

*Briefs of *amici curiae* urging reversal were filed by *Joseph E. Brennan,* Attorney General of Maine, *Edward F. Bradley, Jr.,* Assistant Attorney General, *David H. Souter,* Attorney General of New Hampshire, *Donald W. Stever, Jr.,* Assistant Attorney General, and *Julius C. Michaelson,* Attorney General of Rhode Island, for the States of Maine, New Hampshire, and Rhode Island; by *Francis X. Bellotti,* Attorney General, and *Terence P. O'Malley* and *Howard Whitehead,* Assistant Attorneys General, for the Commonwealth of Massachusetts; by *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Philip Weinberg* and *John G. Proudfit,* Assistant Attorneys General, for the State of New York; and by *Ammon G. Dunton, Jr.,* and *Philip B. Kurland* for the Virginia Seafood Council et al.

*Solicitor General Bork, Assistant Attorney General Taft, Deputy Solicitor General Randolph, Bruce C. Rashkow,* and *Ralph J. Gillis* filed a brief for the United States as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Richard R. Wier, Jr.,* Attorney General, and *June D. MacArtor* and *Harrison F. Turner,* Deputy Attorneys General, for the State of Delaware; and by *Francis B. Burch,* Attorney General, *Henry R. Lord,* Deputy Attorney General, and *Warren K. Rich,* Assistant Attorney General, for the State of Maryland.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The issue in this case is the validity of two Virginia statutes that limit the right of nonresidents and aliens to catch fish in the territorial waters of the Commonwealth.

I

Persons or corporations wishing to fish commercially in Virginia must obtain licenses. Section 28.1–81.1 of the Virginia Code (§ 81.1) (Supp. 1976),[1] enacted in 1975, limits the

---

[1] Section 28.1–81.1 provides:

"Licenses for taking of fish restricted to United States citizens.— (a) No commercial license for the taking of food fish or fish for the manufacture into fish meal, fish oil, fish scrap or other purpose shall be granted to any person not a citizen of the United States, nor to any firm, partnership, or association unless each participant therein shall be a citizen of the United States, nor to any corporation unless the same be a citizen of the United States as hereinafter defined. This requirement shall be in addition to, and not in lieu of, any other requisite to the issuance of a license imposed by this chapter or any other provision of the Code of Virginia as amended from time to time.

"(b) Within the meaning of this section, no corporation shall be deemed a citizen of the United States unless seventy-five per centum of the interest therein shall be owned by citizens of the United States and unless its president or other chief executive officer and the chairman of its board of directors are citizens of the United States and unless no more of its directors than a minority of the number necessary to constitute a quorum are noncitizens and the corporation is organized under the laws of the United States or of a state, territory, district, or possession thereof.

"(c) Seventy-five per centum of the interest in a corporation shall not be deemed to be owned by citizens of the United States (i) if the title to seventy-five per centum of its stock is not vested in such citizens free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; or (ii) if seventy-five per centum of the voting power in such corporation is not vested in citizens of the United States; or (iii) if, through any contract or understanding, it is so arranged that more than twenty-five per centum of the voting power in such corporation may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or (iv) if by any other means whatsoever

issuance of commercial fishing licenses to United States citizens. Under this law, participants in any licensed partnership, firm, or association must be citizens. A fishing business organized in corporate form may be licensed only if it is chartered in this country; American citizens own and control at least 75% of its stock; and its president, board chairman, and controlling board majority are citizens.

Section 28.1–60 of the Virginia Code (§ 60) (Supp. 1976) [2]

control of any interest in the corporation in excess of twenty-five per centum is conferred upon or permitted to be exercised by any person who is not a citizen of the United States."

[2] Section 28.1–60 provides in pertinent part:

"Nonresidents generally.—(1) *Catching fish for oil or guano prohibited.*—No nonresident of this State shall take or catch any fish, in the waters of the Commonwealth, or in the waters under its joint jurisdiction, for the purpose of converting the same into oil, fish scrap, fish meal or guano, except as hereinafter provided; nor shall any nonresident be concerned or interested with any resident as partner or otherwise, except as a stockholder in a domestic corporation, in taking or catching fish in any of the waters of this State to be manufactured into oil, fish scrap, fish meal or guano, or in such manufacture, except as hereinafter provided.

"(2) *Resident not to be interested.*—Nor shall any resident of this State be concerned or interested with any nonresident as partner or otherwise, except as stockholder in a domestic corporation, in taking or catching fish in any of the waters of this State to be manufactured into oil, fish scrap, fish meal or guano, or in such manufacture, except as hereinafter provided, or knowingly permit any nonresident to use his name for either purpose.

"(3) *License for taking menhaden fish.*—A nonresident person, firm or corporation may take or catch the fish known as 'menhaden,' within the three-mile limit on the seacoast of Virginia and east of a straight line drawn from Cape Charles Lighthouse to Cape Henry Lighthouse for the purpose of converting the same into oil, fish scrap, fish meal or guano between the third Monday of May and the third Friday of November, inclusive, of each year; provided such person, firm or corporation has applied for and obtained license to take and catch such fish within the above-defined area and in accordance with the following requirements.

. . . . .

"(6) *Penalty for violation.*—Any person, firm or corporation violating any of the provisions of this section shall be guilty of a misdemeanor."

governs licensing of nonresidents of Virginia to fish for menhaden, an inedible but commercially valuable species of fin fish.[3] Section 60 allows nonresidents who meet the citizenship requirements of § 81.1 to obtain licenses to fish for menhaden in the three-mile-wide belt of Virginia's territorial sea off the Commonwealth's eastern coastline. At the same time, however, § 60 prohibits nonresidents from catching menhaden in the Virginia portion of Chesapeake Bay.

Appellee Seacoast Products, Inc., is one of three companies that dominate the menhaden industry. The other two firms, unlike Seacoast, have fish-processing plants in Virginia and are owned by American citizens. Hence, they are not affected by either of the restrictions challenged in this case. Seacoast was founded in New Jersey in 1911 and maintains its principal offices in that State; it is incorporated in Delaware and qualified to do business in Virginia. The other appellees are subsidiaries of Seacoast; they are incorporated and maintain plants and offices in States other than Virginia. In 1973,

---

[3] The menhaden industry is, in terms of landed tonnage, the largest fishery in the United States, accounting for about 45% of our total commercial fish catch. The 1975 harvest was valued at about $50 million fresh and $80 million after processing. Menhaden are processed and used for industrial purposes including the manufacture of antibiotics, poultry and animal feed, paint, soap, lubricants, and, in Canada and Europe, margarine. The fish spend much of their life cycle in coastal estuaries or shallow water close to the ocean shore. Indeed, over 95% of the 1.8 billion pounds of menhaden taken in 1975 were caught within three miles of the coast. The fish are only found far offshore in deep water during the winter months along the South Atlantic coast. In March, they begin a northward migration traveling up the east coast in enormous schools, with some ultimately reaching north of Cape Cod. Most of the fish reverse this migration path in the fall. It is feasible to fish commercially for menhaden only during the migratory period when they are in large, dense schools close to the surface. Estuaries like the Chesapeake Bay are important nurturing grounds for the species. See U. S. Department of Commerce, Fisheries of the United States, 1975, pp. 18, 37 (1976); App. 24–25, 32–33, 73–89, 92–113.

the family of Seacoast's founder sold the business to Hanson Trust, Ltd., a United Kingdom company almost entirely owned by alien stockholders. Seacoast continued its operations unchanged after the sale. All of its officers, directors, boat captains, and crews are American citizens, as are over 95% of its plant employees.

At the time of its sale, Seacoast's fishing vessels were enrolled and licensed American-flag ships. See *infra,* at 272–274. Under 46 U. S. C. §§ 808, 835, the transfer of these vessels to a foreign-controlled corporation required the approval of the Department of Commerce. This was granted unconditionally over the opposition of Seacoast's competitors after a full public hearing that considered the effect of the transfer on fish conservation and management, on American workers and consumers, and on competition and other social and economic concerns. See 38 Fed. Reg. 29239–29240 (1973); 39 Fed. Reg. 7819, 33812–33813 (1974); App. 29–32. Following this approval, appellees' fishing vessels were re-enrolled and relicensed pursuant to 46 U. S. C. §§ 251–252, 263. They remain subject to all United States laws governing maritime commerce.

In past decades, although not recently, Seacoast had operated processing plants in Virginia and was thereby entitled to fish in Chesapeake Bay as a resident. Tr. of Oral Arg. 28–29, 34. More recently, Seacoast obtained nonresident menhaden licenses as restricted by § 60 to waters outside Chesapeake Bay. In 1975, however, § 81.1 was passed by the Virginia Legislature, c. 338, 1975 Va. Acts, and appellant James E. Douglas, Jr., the Commissioner of Marine Resources for Virginia, denied appellees' license applications on the basis of the new law. Seacoast and its subsidiaries were thereby completely excluded from the Virginia menhaden fishery.

Appellees accordingly filed a complaint in the District Court for the Eastern District of Virginia, seeking to have §§ 60 and 81.1 declared unconstitutional and their enforcement enjoined. A three-judge court was convened and it

struck down both statutes. It held that the citizenship requirement of § 81.1 was pre-empted by the Bartlett Act, 16 U. S. C. § 1081 *et seq.*, and that the residency restriction of § 60 violated the Equal Protection Clause of the Fourteenth Amendment. We noted probable jurisdiction of the Commissioner's appeal, 425 U. S. 949 (1976), and we affirm.[4]

## II

Seacoast advances a number of theories to support affirmance of the judgment below. See *Fusari* v. *Steinberg,* 419 U. S. 379, 387 n. 13 (1975); *Dandridge* v. *Williams,* 397 U. S. 471, 475 n. 6 (1970). Among these is the claim that the Virginia statutes are pre-empted by federal enrollment and licensing laws for fishing vessels.[5] The United States has filed a brief as *amicus curiae* supporting this contention. Al-

---

[4] Appellant's contention that the District Court should have abstained in this case to allow the Virginia courts to decide the validity of the statutes is without merit. Appellant suggests that under recent decisions, *e. g., In re Griffiths,* 413 U. S. 717 (1973); *Sugarman* v. *Dougall,* 413 U. S. 634 (1973); *Graham* v. *Richardson,* 403 U. S. 365 (1971), the alienage classification established in § 81.1 might well be ruled unconstitutional by the state courts as applied to individual resident aliens. That result is certainly plausible. See *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410 (1948). It is also irrelevant.

Abstention is proper in this context only where it can be "fairly concluded that the underlying state statute is susceptible of an interpretation that might avoid the necessity for constitutional adjudication." *Kusper* v. *Pontikes,* 414 U. S. 51, 55 (1973). But appellant's suggestion would not resolve any of the claims raised by appellees. In such circumstances, it is the "solemn responsibility" of "all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." *Zwickler* v. *Koota,* 389 U. S. 241, 248 (1967).

[5] Appellees argue in addition that federal fisheries law constitutes a comprehensive regulatory scheme not admitting of conflicting state laws. They also urge that the Virginia statutes violate the Equal Protection and Commerce Clauses and interfere with federal control of international relations.

though the claim is basically constitutional in nature, deriving its force from the operation of the Supremacy Clause, Art. VI, cl. 2, it is treated as "statutory" for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications. See *Hagans* v. *Lavine,* 415 U. S. 528, 549 (1974).[6] Since we decide the case on this ground, we do not reach the constitutional issues raised by the parties.

The well-known principles of pre-emption have been rehearsed only recently in our decisions. See, *e. g., Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525–526 (1977); *De Canas* v. *Bica,* 424 U. S. 351 (1976). No purpose would be served by repeating them here. It is enough to note that we deal in this case with federal legislation arguably superseding state law in a "field which . . . has been traditionally occupied by the States." *Jones* v. *Rath Packing Co., supra,* at 525. Pre-emption accordingly will be found only if " 'that was the clear and manifest purpose of Congress.' *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947)." *Ibid.* We turn our focus, then, to the congressional intent embodied in the enrollment and licensing laws.

## A

The basic form for the comprehensive federal regulation of trading and fishing vessels was established in the earliest days of the Nation and has changed little since. Ships engaged in trade with foreign lands are "registered," a documentation procedure set up by the Second Congress in the Act of Dec. 31, 1792, 1 Stat. 287,[7] and now codified in 46 U. S. C., c. 2. "The purpose of a register is to declare the nationality of a

---

[6] The claim is, of course, statutory in the sense that it depends on interpretation of an Act of Congress, and like any other statutory decision, the result we reach here is subject to legislative overruling.

[7] Vessel documentation actually dates from the first months of the Federal Government. See Act of Sept. 1, 1789, 1 Stat. 55, repealed by the Acts discussed in the text.

vessel . . . and to enable her to assert that nationality wherever found." *The Mohawk,* 3 Wall. 566, 571 (1866); *Anderson* v. *Pacific Coast S. S. Co.,* 225 U. S. 187, 199 (1912). Vessels engaged in domestic or coastwise trade or used for fishing are "enrolled" under procedures established by the Enrollment and Licensing Act of Feb. 18, 1793, 1 Stat. 305, codified in 46 U. S. C., c. 12. "The purpose of an enrollment is to evidence the national character of a vessel . . . and to enable such vessel to procure a . . . license." *The Mohawk, supra; Anderson* v. *Pacific Coast S. S. Co., supra.*

A "license," in turn, regulates the use to which a vessel may be put and is intended to prevent fraud on the revenue of the United States. See 46 U. S. C. §§ 262, 263, 319, 325; 46 CFR § 67.01–13 (1976). The form of a license is statutorily mandated: "license is hereby granted for the . . . [vessel] to be employed in carrying on the (. . . 'coasting trade,' 'whale fishery,' 'mackerel fishery,' or 'cod fishery,' [8] as the case may be), for one year from the date hereof, and no longer." 46 U. S. C. § 263. The law also provides that properly enrolled and licensed vessels [9] "and no others, shall be deemed vessels of the United States entitled to the privileges of vessels employed in the coasting trade or fisheries." § 251. Appellees' vessels were granted licenses for the "mack-

---

[8] The quaint categories of the statute have remained unchanged since the "mackerel fishery" was added by the Act of May 24, 1828, c. 119, 4 Stat. 312. They seem to correspond to the only three types of sea creatures sought by organized fishing fleets at that time. See L. Sabine, Report on the Principal Fisheries of the American Seas, H. R. Exec. Doc. No. 23, 32d Cong., 2d Sess., 181 (1853).

A license for the "mackerel fishery" entitles the holder to catch "cod or fish of any other description whatever." Act of Apr. 20, 1836, c. 55, 5 Stat. 16, 46 U. S. C. § 325; 46 CFR § 67.07–13 (b) (1976).

[9] A vessel of more than 5 but less than 20 tons need not be enrolled in order to obtain a license. See 46 U. S. C. §§ 251, 262, 263; 46 CFR §§ 67.01–1, 67.07–13 (a) (1976). No documentation is required for a vessel of less than five net tons. 46 CFR § 67.01–11 (a) (5) (1976).

erel fishery"[10] after their transfer was approved by the Department of Commerce.

The requirements for enrollment and registration are the same. 46 U. S. C. § 252; *The Mohawk, supra,* at 571–572. Insofar as pertinent here, enrolled and registered vessels must meet identification, measurement, and safety standards, generally must be built in the United States, and must be owned by citizens. An exception to the latter rule permits a corporation having alien stockholders to register or enroll ships if it is organized and chartered under the laws of the United States or of any State, if its president or chief executive officer and the chairman of its board of directors are American citizens, and if no more of its directors than a minority of the number necessary to constitute a quorum are noncitizens. 46 U. S. C. § 11; 46 CFR § 67.03–5 (a) (1976). The Shipping Act, 1916, further limits foreign ownership of American vessels by requiring the Secretary of Commerce to approve any transfer of an American-owned vessel to noncitizens. 46 U. S. C. § 808.[11]

B

Deciphering the intent of Congress is often a difficult task, and to do so with a law the vintage of the Enrollment and Licensing Act verges on the impossible. There is virtually no surviving legislative history for the Act.[12] What we do have,

---

[10] See n. 8, *supra.*

[11] A corporation is considered to be a citizen for purposes of this requirement only if it meets the same citizenship tests imposed for registration of a vessel and, in addition, if citizens own a controlling interest in it, or for a vessel used in the coastwise trade, if citizens own a 75% interest. 46 U. S. C. § 802.

As noted above, appellees received approval from the Secretary of Commerce for the transfer of their vessels to the ultimate ownership of the noncitizen Hanson Trust, Ltd.

[12] See 3 Annals of Cong. 671, 728, 738, 748, 750, 752 (1972). This history contains no debates; it merely records the legislative steps in passage of the Act. There are no committee reports available.

however, is the historic decision of Mr. Chief Justice John Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824), rendered only three decades after passage of the Act. *Gibbons* invalidated a discriminatory state regulation of shipping as applied to vessels federally licensed to engage in the coasting trade. Although its historic importance lies in its general discussion of the commerce power, *Gibbons* also provides substantial illumination on the narrower question of the intended meaning of the Licensing Act.

The case challenged a New York law intended to encourage development of steamboats by granting Robert Fulton and Robert Livingston the exclusive right to operate steam-powered vessels in all of the State's territorial waters. The right to navigate steamboats between Elizabethtown Point, N. J., and New York City was, by assignment from Fulton and Livingston, granted to Aaron Ogden. Thomas Gibbons began operating two passenger ferries in violation of Ogden's submonopoly. Gibbons' steamboats had been enrolled and granted "license . . . to be employed in carrying on the coasting trade" under the Enrollment and Licensing Act. *Id.,* at 203.

Ogden nevertheless obtained an injunction from the New York courts enforcing the monopoly by restraining Gibbons from running his ferries in New York waters. Chancellor James Kent rejected Gibbons' pre-emption claim based upon his federal licenses. Kent found that the sole purpose of the license was to "giv[e] to the vessel an *American* character," *i. e.,* to establish its nationality as an American-flag ship. This would have reduced various duties and taxes assessed under federal law, but in Kent's view, it did not oust the power of the State to regulate the use of chattels within its borders. 4 Johns. Ch. 150, 156–159 (1819). The highest state court affirmed, ruling that "the only effect" of the license was "to determine [the vessel's] national character, and the rate of duties which she is to pay." 17 Johns. 488, 509 (1820).

On appeal to this Court, Mr. Chief Justice Marshall held that the rights granted to Gibbons by federal law superseded the conflicting state-created rights asserted by Ogden. Marshall first considered the power of Congress under the Commerce Clause. He concluded that "[c]ommerce among the States, cannot stop at the external boundary line of each State, but may be introduced into the interior," 9 Wheat., at 194, and that "[t]he power of Congress . . . , whatever it may be, must be exercised within the territorial jurisdiction of the several States." *Id.*, at 196. The Court next defined the nature of the commerce power: "the power to regulate; that is, to prescribe the rule by which commerce is to be governed." *Ibid.* Ogden's claim that the States may exercise concurrent power over commerce, or even exercise their police powers, where that exercise conflicts with express federal law was rejected. *Id.*, at 200–210.

The Court then turned to the question whether "the laws of New-York" did "come into collision with an act of Congress" so that "the acts of New-York must yield to the law of Congress." *Id.*, at 210. Mr. Chief Justice Marshall found the conflict unquestionable: "To the Court it seems very clear, that the whole act on the subject of the coasting trade, according to those principles which govern the construction of statutes, implies, unequivocally, an authority to licensed vessels to carry on the coasting trade." *Id.*, at 212. The license granted to Gibbons under the Act "must be understood to be what it purports to be, a legislative authority to [Gibbons'] steamboat . . . 'to be employed in carrying on the coasting trade, for one year from this date.'" *Id.*, at 214. The Court rejected Ogden's argument—and the holding of the New York courts—that the license "gives no right to trade; and that its sole purpose is to confer the American character." *Ibid.* Finally, the Court decided that the statutory phrase "coasting trade" encompassed the carriage of passengers for hire as well as the transport of goods. *Id.*, at 215–219.

Although *Gibbons* is written in broad language which might suggest that the sweep of the Enrollment and Licensing Act ousts all state regulatory power over federally licensed vessels, neither the facts before the Court nor later interpretations extended that far. *Gibbons* did not involve an absolute ban on steamboats in New York waters. Rather, the monopoly law allowed some steam vessels to ply their trade while excluding others that were federally licensed. The case struck down this discriminatory treatment. Subsequent decisions spelled out the negative implication of *Gibbons:* that States may impose upon federal licensees reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power.

For example, in *Smith* v. *Maryland,* 18 How. 71 (1855), the Court upheld a conservation law which limited the fishing implements that could be used by a federally licensed vessel to take oysters from state waters. The Court held that an "enrolment and license confer no immunity from the operation of valid laws of a State," *id.,* at 74, and that the law was valid because the State "may forbid all such acts as would render the public right [of fishery] less valuable, or destroy it altogether," *id.,* at 75. At the same time, the Court explicitly reserved the question of the validity of a statute discriminating against nonresidents. *Ibid.* To the same effect is the holding in *Manchester* v. *Massachusetts,* 139 U. S. 240 (1891). There, state law prohibited the use by any person of certain types of fishing tackle in specified areas. Though Manchester was a Rhode Island resident basing a claim on his federal fisheries license, the Court held that the statute

> "was evidently passed for the preservation of the fish, and makes no discrimination in favor of citizens of Massachusetts and against citizens of other States. . . . [T]he statute may well be considered as an impartial and reasonable regulation . . . and the subject is one which a State may well be permitted to regulate within its

territory, in the absence of any regulation by the United States. The preservation of fish . . . is for the common benefit; and we are of opinion that the statute is not repugnant to the Constitution and the laws of the United States." *Id.*, at 265.

More recently, the same principle was applied in *Huron Portland Cement Co. v. Detroit*, 362 U. S. 440 (1960), where we held that the city's Smoke Abatement Code was properly applicable to licensed vessels. Relying on earlier cases, we noted that "[t]he mere possession of a federal license . . . does not immunize a ship from the operation of the normal incidents of local police power." *Id.*, at 447. As an "[e]ven-handed local regulation to effectuate a legitimate local public interest," *id.*, at 443, the ordinance was valid.

Although it is true that the Court's view in *Gibbons* of the intent of the Second Congress in passing the Enrollment and Licensing Act is considered incorrect by commentators,[13] its

---

[13] Criticism began in the concurring opinion of Mr. Justice Johnson, 9 Wheat., at 222, 231–233. He thought the Enrollment and Licensing Act was simply the American formulation of a navigation Act, commonly used by commercial nations to encourage shipping on vessels owned and manned by their citizens to promote the local economy and assure maritime strength in case of war. See generally G. Gilmore & C. Black, Jr., The Law of Admiralty §§ 11–3, 11–4 (2d ed. 1975).

Chancellor Kent soon exercised his prerogative as the country's foremost legal scholar to take sharp exception to Marshall's statutory construction:

"If congress had intended that a coasting license should confer power and control, and a claim of sovereignty subversive of local laws of the states within their own jurisdictions, it was supposed they would have said so in plain and intelligible language, and not have left their claim of supremacy to be hidden from the observation and knowledge of the state governments, in the unpretending and harmless shape of a coasting license, obviously intended for other purposes.

.       .       .       .       .       .

"The only great point on which the Supreme Court of the United States, and the courts of this state, have differed, is in the construction and effect given to a coasting license. . . . The formidable effect which has been given

provisions have been repeatedly re-enacted in substantially the same form.[14] We can safely assume that Congress was aware of the holding, as well as the criticism,[15] of a case so renowned as *Gibbons*. We have no doubt that Congress has ratified the statutory interpretation of *Gibbons* and its progeny. See *Albemarle Paper Co. v. Moody,* 422 U. S. 405, 414 n. 8 (1975); *Snyder v. Harris,* 394 U. S. 332, 339 (1969); *Francis v. Southern Pacific Co.,* 333 U. S. 445, 449–450 (1948). We consider, then, its impact on the Virginia statutes challenged in this case.

---

to a coasting license, was a perfect surprise upon the judicial authorities of this state; and none of the persons concerned in the former decisions in our state courts on this subject, ever entertained the idea, as I apprehend, that congress intended, by a coasting license, a grant of power that was to bear down all state regulations of internal commerce that stood in its way." 1 J. Kent, Commentaries on American Law 408, 411 (1st ed. 1826).

Mr. Justice Frankfurter agreed, calling Marshall's view "esoteric statutory construction." F. Frankfurter, The Commerce Clause 15, 17, 20 (1937). See also R. Faulkner, The Jurisprudence of John Marshall 85 (1968); M. Baxter, The Steamboat Monopoly 34–35, 52 (1972); Campbell, Chancellor Kent, Chief Justice Marshall and the Steamboat Cases, 25 Syracuse L. Rev. 497, 519–532 (1974); Mann, The Marshall Court: Nationalization of Private Rights and Personal Liberty from the Authority of the Commerce Clause, 38 Ind. L. J. 117, 180–181, 209–212, 236–237 (1963).

[14] See Act of May 24, 1828, c. 119, 4 Stat. 312 (adding "mackerel fishery" category); Act of Apr. 20, 1836, c. 55, 5 Stat. 16 (permitting capture of all types of fish on mackerel license); Rev. Stat. §§ 4311, 4321 (1878) (codifying license provisions); Act of Apr. 18, 1874, c. 110, 18 Stat. 31 (exempting canal boats); Act of May 20, 1936, c. 434, 49 Stat. 1367 (license form amended and re-enacted). Cf. Act of Feb. 28, 1887, c. 288, 24 Stat. 435 (temporarily applying a fishing season for mackerel to federal licenses).

[15] In addition to the contemporary comments of Mr. Justice Johnson and Chancellor Kent, see n. 13, *supra,* Thomas Jefferson's well-publicized letters were highly critical of what he saw as undue expansion of federal power, exemplified by *Gibbons*. See 1 C. Warren, The Supreme Court in United States History 620–621 (1937 ed.).

## C

The federal licenses granted to Seacoast are, as noted above, identical in pertinent part to Gibbons' licenses except that they cover the "mackerel fishery" rather than the "coasting trade." Appellant contends that because of the difference this case is distinguishable from *Gibbons*. He argues that *Gibbons* upheld only the right of the federal licensee, as an American-flag vessel, to navigate freely in state territorial waters. He urges that Congress could not have intended to grant an additional right to take fish from the waters of an unconsenting State. Appellant points out that the challenged statutes in no way interfere with the navigation of Seacoast's fishing boats. They are free to cross the State's waters in search of fish in jurisdictions where they may lawfully catch them, and they may transport fish through the State's waters with equal impunity.

Appellant's reading of *Gibbons* is too narrow. *Gibbons* emphatically rejects the argument that the license merely establishes the nationality of the vessel. That function is performed by the enrollment. 9 Wheat., at 214. Rather, the license "implies, unequivocally, an authority to licensed vessels to carry on" the activity for which they are licensed. *Id.*, at 212. In *Gibbons*, the "authority . . . to carry on" the licensed activity included not only the right to navigate in, or to travel across, state waters, but also the right to land passengers in New York and thereby provide an economically valuable service. The right to perform that additional act of landing cargo in the State—which gave the license its real value—was part of the grant of the right to engage in the "coasting *trade*." See *Harman* v. *Chicago*, 147 U. S. 396, 405 (1893).

The same analysis applies to a license to engage in the mackerel fishery. Concededly, it implies a grant of the right to navigate in state waters. But, like the trading license, it must give something more. It must grant "author-

ity . . . to carry on" the "mackerel *fishery*." And just as *Gibbons* and its progeny found a grant of the right to trade in a State without discrimination, we conclude that appellees have been granted the right to fish in Virginia waters on the same terms as Virginia residents.

Moreover, 46 U. S. C. § 251 states that properly documented vessels "and no others" are "entitled to the privileges of vessels employed in the coasting trade or fisheries." Referring to this section, *Gibbons* held: "[T]hese privileges . . . cannot be enjoyed, unless the trade may be prosecuted. The grant of the privilege . . . convey[s] the right [to carry on the licensed activity] to which the privilege is attached." 9 Wheat., at 213. Thus, under § 251 federal licensees are "entitled" to the same "privileges" of fishery access as a State affords to its residents or citizens.

Finally, our interpretation of the license is reaffirmed by the specific discussion in *Gibbons* of the section granting the license, now 46 U. S. C. § 263. The Court pointed out that "a license to do any particular thing, is a permission or authority to do that thing; and if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize. It certainly transfers to him all the right which the grantor can transfer, to do what is within the terms of the license." 9 Wheat., at 213–214. *Gibbons* recognized that the "grantor" was Congress. *Id.*, at 213. Thus *Gibbons* expressly holds that the words used by Congress in the vessel license transfer to the licensee "all the right" which Congress has the power to convey. While appellant may be correct in arguing that at earlier times in our history there was some doubt whether Congress had power under the Commerce Clause to regulate the taking of fish in state waters,[16] there can be no question today that such power

---

[16] See, *e. g.*, *McCready* v. *Virginia,* 94 U. S. 391, 395 (1877) ("There has been . . . no . . . grant of power over the fisheries [to the United States]. These remain under the exclusive control of the State . . .");

282

exists where there is some effect on interstate commerce. *Perez* v. *United States,* 402 U. S. 146 (1971); *Heart of Atlanta Motel* v. *United States,* 379 U. S. 241 (1964); *Wickard* v. *Filburn,* 317 U. S. 111 (1942). The movement of vessels from one State to another in search of fish, and back again to processing plants, is certainly activity which Congress could conclude affects interstate commerce. Cf. *Toomer* v. *Witsell,* 334 U. S. 385, 403–406 (1948).[17] Accordingly, we hold that, at the least, when Congress re-enacted the license form in 1936,[18] using language which, according to *Gibbons,* gave licensees "all the right which the grantor can transfer," it necessarily extended the license to cover the taking of fish in state waters, subject to valid state conservation regulations.[19]

*Manchester* v. *Massachusetts,* 139 U. S. 240, 258–260 (1891); *Geer* v. *Connecticut,* 161 U. S. 519 (1896); 17 Cong. Rec. 4734 (1886) (conservation amendment to fisheries license, Act of Feb. 28, 1887, c. 288, 24 Stat. 435, see n. 14, *supra,* believed not to apply to state territorial waters).

[17] Appellant also cites cases describing fishing as a "local activity," *Alaska* v. *Arctic Maid,* 366 U. S. 199, 203 (1961), and as one that "occurs before the [fish] can be said to have entered the flow of interstate commerce," *Toomer* v. *Witsell,* 334 U. S., at 395. But these statements were made in upholding the right of States to tax what was argued to be interstate commerce. Pronouncements made in that context are not used interchangeably as statements of law where the issue is the power of Congress to regulate under the Commerce Clause. The restrictions imposed by the Commerce Clause standing alone may well be less than the pre-emptive reach of statutes passed by Congress pursuant to the power. Cf. *Wickard* v. *Filburn,* 317 U. S., at 121–122. No federal statutory claim was raised in *Toomer* or *Arctic Maid,* and in both cases the Court noted that the challenged statute did not discriminate against interstate commerce.

[18] Act of May 20, 1936, c. 434, 49 Stat. 1367. We are confident that Congress, in the midst of the New Deal legislative program, broadly construed its powers under the Commerce Clause at this time. See, *e. g., Wickard* v. *Filburn.*

[19] Indeed, an amendment to the license form made at the time of the 1936 re-enactment specifically authorizes "the taking of fish." Acting to reverse a Circuit Court of Appeals decision, *The Pueblos,* 77 F. 2d 618

## D

Application of the foregoing principles to the present case is straightforward. Section 60 prohibits federally licensed vessels owned by nonresidents of Virginia from fishing in the Chesapeake Bay. Licensed ships owned by noncitizens are prevented by § 81.1 from catching fish anywhere in the Commonwealth. On the other hand, Virginia residents are permitted to fish commercially for menhaden subject only to seasonal and other conservation restrictions not at issue here. The challenged statutes thus deny appellees their federally granted right to engage in fishing activities on the same terms as Virginia residents. They violate the "indisputable" precept that "no State may completely exclude federally licensed commerce." *Florida Lime & Avocado Growers* v. *Paul,* 373 U. S. 132, 142 (1963). They must fall under the Supremacy Clause.

Appellant seeks to escape this conclusion by arguing that the Submerged Lands Act, 67 Stat. 29, 43 U. S. C. §§ 1301–1315, and a number of this Court's decisions [20] recognize that the States have a title or ownership interest in the fish swimming in their territorial waters. It is argued that because the States "own" the fish, they can exclude federal licensees. The contention is of no avail.

The Submerged Lands Act does give the States "title," "ownership," and "the right and power to manage, administer, lease, develop, and use" the lands beneath the oceans and

(CA2 1935), Congress authorized issuance of licenses for the "coasting trade and mackerel fishery." The amendment explains that vessels so documented "shall be deemed to have sufficient license for engaging in the coasting trade and the taking of fish of every description, including shell-fish." 49 Stat. 1368, 46 U. S. C. § 263. See also S. Rep. No. 83, 24th Cong., 1st Sess. (1836), describing the modification in the Enrollment and Licensing Act, 5 Stat. 16, see nn. 8, 14, *supra,* as intended "to enable those engaged in the mackerel fishery to take other fish without incurring a penalty."

[20] See cases cited in n. 16, *supra.*

natural resources in the waters within state territorial jurisdiction. 43 U. S. C. §1311 (a). But when Congress made this grant pursuant to the Property Clause of the Constitution, see *Alabama* v. *Texas,* 347 U. S. 272 (1954), it expressly retained for the United States "all constitutional powers of regulation and control" over these lands and waters "for purposes of commerce, navigation, national defense, and international affairs." *United States* v. *Louisiana,* 363 U. S. 1, 10 (1960); see 43 U. S. C. § 1314 (a). Since the grant of the fisheries license is made pursuant to the commerce power, see *supra,* at 281–282; *Wiggins Ferry Co.* v. *East St. Louis,* 107 U. S. 365, 377 (1883), the Submerged Lands Act did not alter its pre-emptive effect. Certainly Congress did not repeal by implication, in the broad language of the Submerged Lands Act, the Licensing Act requirement of equal treatment for federal licensees.

In any event, "[t]o put the claim of the State upon title is," in Mr. Justice Holmes' words, "to lean upon a slender reed." *Missouri* v. *Holland,* 252 U. S. 416, 434 (1920). A State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of "owning" wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture. *Ibid.; Geer* v. *Connecticut,* 161 U. S. 519, 539–540 (1896) (Field, J., dissenting). The "ownership" language of cases such as those cited by appellant must be understood as no more than a 19th-century legal fiction expressing "the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." *Toomer* v. *Witsell,* 334 U. S., at 402; see also *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 420–421 (1948). Under modern analysis, the question is simply whether the State has exercised its police power in

conformity with the federal laws and Constitution. As we have demonstrated above, Virginia has failed to do so here.[21]

## III

Our decision is very much in keeping with sound policy considerations of federalism. The business of commercial fishing must be conducted by peripatetic entrepreneurs moving, like their quarry, without regard for state boundary lines. Menhaden that spawn in the open ocean or in coastal waters of a Southern State may swim into Chesapeake Bay and live there for their first summer, migrate south for the following winter, and appear off the shores of New York or Massachusetts in succeeding years. A number of coastal States have discriminatory fisheries laws,[22] and with all natural resources

---

[21] Appellant claims that the challenged statutes have a legitimate conservation purpose. He argues that § 81.1 is a valid response to the grave problem of overfishing of American marine stocks by foreign fleets. Similarly, § 60 is said to be an essential enforcement mechanism for net-size restrictions on menhaden fishermen.

The claims are specious. Virginia makes no attempt to restrict the quantity of menhaden caught by her own residents. A statute that leaves a State's residents free to destroy a natural resource while excluding aliens or nonresidents is not a conservation law at all. It bears repeating that a "state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition." *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 538 (1949). A State cannot escape this principle by cloaking objectionable legislation in the currently fashionable garb of environmental protection. Moreover, despite its foreign ownership, Seacoast is subject to all United States shipping and fisheries laws. And the record does not support the claim based on enforcement of the net-size restriction.

Furthermore, the cases upon which appellant relies are factually distinguishable. In *McCready* v. *Virginia* and *Geer* v. *Connecticut* neither petitioner asserted a claim under a pre-emptive Act of Congress. *Smith* v. *Maryland,* 18 How. 71 (1855), *Manchester* v. *Massachusetts,* 139 U. S. 240 (1891), and *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440 (1960), did raise Licensing Act claims, but the statutes there upheld operated equally against residents and nonresidents.

[22] Among those States filing briefs as *amici curiae* in support of Virginia,

becoming increasingly scarce and more valuable, more such restrictions would be a likely prospect, as both protective and retaliatory measures.[23]   Each State's fishermen eventually might be effectively limited to working in the territorial waters of their residence, or in the federally controlled fishery beyond the three-mile limit.[24]   Such proliferation of residency requirements for commercial fishermen would create precisely the sort of Balkanization of interstate commercial activity that the Constitution was intended to prevent.  See, *e. g.,* *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 532–539 (1949); cf. *Allenberg Cotton Co.* v. *Pittman,* 419 U. S. 20 (1974).   We cannot find that Congress intended to allow any such result given the well-known construction of federal vessel licenses in *Gibbons.*

For these reasons, we conclude that §§ 60 and 81.1 are pre-empted by the federal Enrollment and Licensing Act.   Insofar as these state laws subject federally licensed vessels owned by nonresidents or aliens to restrictions different from those applicable to Virginia residents and American citizens, they

---

see, *e. g.,* Md. Nat. Res. Ann. Code §§ 4–703, 4–704 (b) (1974); Mass. Gen. Laws Ann. c. 130, § 99 (1974); Act of Feb. 20, 1923, 1923 Mass. Acts c. 35, as amended by Act of Mar. 13, 1962, 1962 Mass. Acts c. 219; Act of Mar. 23, 1936, 1936 Mass. Acts c. 158; N. Y. Envir. Conserv. Law §§ 13–0333 (4), 13–0335 (2), 13–0341 (7) (McKinney 1973). See also Va. Code Ann. § 28.1–57 (1973).

[23] The Court was aware of this threat in *Gibbons.*  A number of States had enacted steamboat monopoly legislation. See, *e. g.,* Abel, Commerce Regulation before *Gibbons v. Ogden:* Interstate Transportation Facilities, 25 N. C. L. Rev. 121, 159–160 (1947); M. Baxter, The Steamboat Monopoly 7, 16 (1972).  Connecticut and Ohio retaliated against the Livingston-Fulton monopoly by forbidding its licensees from entering their waters; New Jersey not only did that, but also granted a right of action for treble damages against anyone obtaining an injunction under New York law.  See *Gibbons* v. *Ogden,* 9 Wheat., at 4–5 (argument of Daniel Webster); Abel, *supra,* at 160; Baxter, *supra,* at 25–30.

[24] As of March 1, 1977, United States jurisdiction for fishery management was extended from 12 to 200 nautical miles from our coasts.  90 Stat. 336, 16 U. S. C. § 1811 (1976 ed.).

must fall under the Supremacy Clause. As we have noted above, however, reasonable and evenhanded conservation measures, so essential to the preservation of our vital marine sources of food supply, stand unaffected by our decision.

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE POWELL joins, concurring in the judgment and concurring in part and dissenting in part.

I concur in the judgment of the Court and join in all but Parts II–D, and III of its opinion. As the Court states, it appears that licenses issued to appellees' ships under the federal licensing statute, 46 U. S. C. § 263, confer upon their grantees an affirmative right to engage in fishing activities in the coastal waters of the United States on the same terms as any other fishermen. I also agree that the federal statute pre-empts similar state licensing legislation which would allow some to engage in the fishery while absolutely excluding any federal licensees. This, I believe, is as much as need be said to decide the case before us. Rather than stopping there, however, the Court embroiders upon this holding a patchwork of broader language whose purpose is almost as uncertain as its long-run effect.

The Court's treatment of the States' interests in their coastal fisheries appears to me to cut a somewhat broader swath than is justifiable in this context. True enough, the States do not "own" free-swimming creatures within their territorial limits in any conventional sense of that term, *Missouri* v. *Holland,* 252 U. S. 416, 434 (1920); *Pierson* v. *Post,* 3 Cai. 175 (N. Y. 1805). It is therefore no answer to an assertion of federal pre-emptive power that such action amounts to an unconstitutional appropriation of state property. But it is also clear that the States have a substantial proprietary interest—sometimes described as "common ownership," *Geer* v. *Connecticut,* 161 U. S. 519, 529 (1896)—in

the fish and game within their boundaries. This is worthy of mention not because it is inconsistent with anything contained in the Court's opinion, but because I am not sure that the States' substantial regulatory interests are given adequate shrift by a single sentence casting the issue of state regulation as "simply whether the State has exercised its police power in conformity with the federal laws and Constitution." *Ante,* at 284–285.

The precedents of this Court, none of which are disputed today, have upheld a variety of regulations designed to conserve and maintain the collective natural resources of the State. *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440 (1960); *Patsone* v. *Pennsylvania,* 232 U. S. 138 (1914); *Geer* v. *Connecticut, supra; Manchester* v. *Massachusetts,* 139 U. S. 240 (1891); *McCready* v. *Virginia,* 94 U. S. 391 (1877); *Smith* v. *Maryland,* 18 How. 71 (1855); see *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 420–421 (1948). The exact bases for these decisions vary, but the cases are consistent in recognizing that the retained interests of States in such common resources as fish and game are of substantial legal moment, whether or not they rise to the level of a traditional property right. The range of regulations which a State may invoke under these circumstances is extremely broad. Neither mere displeasure with the asymmetry of the pattern of state regulation, nor a sensed tension with a federal statute will suffice to override a state enactment affecting exploitation of such a resource. Barring constitutional infirmities, only a direct conflict with the operation of federal law—such as exists here—will bar the state regulatory action. See *Jones* v. *Rath Packing Co.,* 430 U. S. 519 (1977); *Florida Lime & Avocado Growers* v. *Paul,* 373 U. S. 132, 142 (1963). This is true no matter how "peripatetic" the objects of the regulation or however "Balkanized" the resulting pattern of commercial activity. *Ante,* at 285–287.

Also, I think the Court has decided more than it properly

can in its reading of the Submerged Lands Act. While recognizing the Act as effecting a conveyance to the States of primary ownership and control of both "the lands beneath the oceans and natural resources in the waters within state territorial jurisdiction," *ante,* at 283–284, the Court makes more than can be justified of the statute's clause reserving federal control for "purposes of commerce, navigation, national defense, and international affairs." 43 U. S. C. § 1314 (a). It concludes on the basis of this reservation clause that since the enrollment and licensing statute was enacted under the commerce power, the Submerged Lands Act cannot have altered its pre-emptive effect.

I agree that the Submerged Lands Act does not countermand the pre-emption worked by the federal licensing legislation, but this is not because that legislation was enacted pursuant to one of the four categories of constitutional powers explicitly reserved to the Federal Government in the Act. It seems to me a difficult issue, not to be decided in a single sentence, whether the States take only a statutory title and right of control subject to those encumbrances previously created by exercise of the commerce, navigation, national defense, and international affairs powers. An alternative reading would be that the reservation-of-powers clause only gives fair warning of the possibility that the Government may, at some future time and in furtherance of these specified powers, find it necessary to intrude upon state ownership and management of the coastal submerged lands and natural resources. Such a view would take the statute for what it appears to be on its face—a quitclaim of the entire interest held by the Government when the Act was enacted—rather than a transfer of that interest subject to regulatory enactments previously passed under one of the four powers.

Interpretation of this reservation clause seems unnecessary to me at this time because the primary grant of the Act does not extend to any interest over free-swimming fish. The

title of the statutory section, as originally enacted and as codified, is "Lands Beneath Navigable Waters Within State Boundaries." 67 Stat. 30, 43 U. S. C., c. 29, subch. II. From this and from its language, the statute appears primarily to be a transfer of all property interest in land and natural resources within the three-mile limit. See *United States* v. *Alaska,* 422 U. S. 184, 187 (1975). Section 1311 (a)(1) conveys "title" and "ownership"—to such land and resources and for that reason could not reasonably refer to free-swimming fish which are incapable of such ownership. Section 1311 (a)(2) confers right of administration and control, and identifies the object of the conveyance again as the land and natural resources. Unless the Federal Government had an exclusive power of administration and control over fish—and the background of the legislation does not suggest that it did, see *United States* v. *California,* 332 U. S. 19, 36 (1947); *Skiriotes* v. *Florida,* 313 U. S. 69, 74–75 (1941)—then the § 1311 (a)(2) transfer of the power of administration did not, in fact, alter the pre-existing powers of the States over fish at all, even assuming that it purported to encompass "natural resources" beyond those as to which title was transferred in § 1311 (a) (1). Such legislation which neither affects the actual regulatory powers of the States, nor is explicit in stating that pre-existing federal regulatory measures are repealed, lacks the indicia of intent that would justify finding an implied repeal of federal legislation licensing the taking of fish in the coastal area. This is true quite apart from the reservation of powers in § 1314. I would limit our holding accordingly.