**R.J. SCHOENLANK, Plaintiff,**

v.

**KURZ–MORAN SHIPPING AGENCY and M/T CHERRY VALLEY, her engines, boilers, tackle, etc., in rem, Defendants.**

No. 92 Civ. 7823(CSH).

United States District Court, S.D. New York.

March 28, 1994.

---

Beck & Halberg, New York City (Herbert B. Halberg, Thomas L. Johns, of counsel), for plaintiff.

Lilly Sullivan Purcell Barkan & Junge, P.C., New York City (Peter A. Junge, of counsel), for defendants.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This maritime case involving the liability of the agent of an American-flag vessel for state pilotage fees is before the Court on stipulated facts and the parties' cross-motions for summary judgment.

### Background

Plaintiff R.J. Schoenlank was at the pertinent times a pilot licensed by the State of New Jersey to pilot ocean-going vessels to

and from New York Harbor by way of Sandy Hook. On September 28, 1992, plaintiff offered to pilot the M/T CHERRY VALLEY from Stapleton Anchorage in the Harbor to sea. Plaintiff offered those services to defendant Kurz–Moran Shipping Agencies, Inc., the agent for Margate Shipping Company ("Margate"), the owner of the CHERRY VALLEY. Defendant declined plaintiff's services. The vessel proceeded to sea under the direction of a federally licensed pilot employed by or affiliated with Interport Pilots Agency, Inc., of Fort Monmouth, New Jersey. Plaintiff sues defendant to recover the pilotage fee he would have earned had his services not been refused. Under governing law a vessel's agent is liable for pilotage that should have been paid. The complaint also names the vessel as defendant *in rem*, but she has not been served with process.

On September 28, 1992 the CHERRY VALLEY completed discharge of a bulk oil cargo at a terminal at Bayway, New Jersey. Her itinerary called for her to proceed in ballast to Sewells Point Anchorage, Virginia, presumably to load her next cargo (the stipulated facts are silent on the point).[1] It was on that ballast leg that plaintiff offered his pilotage services to the CHERRY VALLEY and was rebuffed. The vessel arrived at Sewells Point Anchorage on October 1, 1992 and discharged her ballast.[2] On the CHERRY VALLEY's passage from New York to Norfolk, she did not stop at any foreign ports, did not carry any foreign cargo, did not have any domestic cargo for delivery to a foreign port, and was not transporting any merchandise or passengers for hire.

In 1972 Margate and the Maritime Subsidy Board of the United States Department of Commerce entered into a contract for payment by the Board of a construction differential subsidy to help aid Margate build three American-flag oil tankers. The CHERRY VALLEY was one. At the same time Margate and the Board entered into a contract providing for payment by the Government to Margate of an operating differential subsidy

on these three vessels. These subsidy contracts were authorized by the Merchant Marine Act, 1936, 46 U.S.C. app. §§ 1101–1294 (West Ann.Pocket Pt.1993).

*Discussion*

Pilotage is an ancient maritime calling. Its need arises from the inability of the master of a vessel to be familiar with hazards to navigation in all waters and ports of call. Hence the services of the local pilot, celebrated by Mark Twain in his accounts of pilotage on the Mississippi.

█ The Federal Government and the several States touching upon or containing navigable waters have an interest in regulating pilotage to advance marine safety. State pilotage laws also produce revenue. The Federal pilotage statutes are presently codified at 46 U.S.C. §§ 8502–8503 (West Special Pamphlet 1993). They specify the manner in which the States may regulate pilots and the manner in which they may not. The Supreme Court summarized the boundaries of authority in *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 159–60, 98 S.Ct. 988, 995, 55 L.Ed.2d 179 (1978): the Federal pilotage statutes "give the Federal Government exclusive authority to regulate pilots on enrolled vessels and . . . preclude a State from imposing its own pilotage requirements upon them." But "just as it is clear that States may not regulate the pilots of enrolled vessels, it is equally clear that they are free to impose pilotage requirements on registered vessels entering and leaving their ports." The pilotage statutes constitute an exercise in federalism of many years' standing.

To comprehend the legislative boundaries in respect of pilotage, one must also speak the language of vessel documentation under Federal statutes. A useful summary appears in *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 272–73, 97 S.Ct. 1740, 1745, 52 L.Ed.2d 304 (1977): "Ships engaged in trade with foreign lands are 'registered'. . . . Ves-

---

1. Sewells Point Anchorage serves the port of Norfolk, Virginia.

2. The voyage itinerary, Ex. C, says that the vessel "discharged slops." I take "slops" to be an inelegant synonym for "ballast," the term used in the Stipulation of Facts at ¶ 19.

sels engaged in domestic or coastwise trade or used for fishing are 'enrolled' ..."

The statutory scheme, codified in the Vessel Documentation Act of 1980, 46 U.S.C. §§ 12101–23 (West Special Pamphlet 1993), is administered by the United States Coast Guard. The Coast Guard issues each American-flag vessel a certificate of documentation. The certificate may be "endorsed" for one or more of five categories of use: registry (for foreign trade), coastwise (for domestic trade), Great Lakes, fishery, and recreational. A certificate endorsement is, in practical effect, a license permitting the vessel to engage in the designated activity. Since a vessel may obtain one or more endorsements, she may on one voyage be sailing "on register" and on another "coastwise."

■ The Federal pilotage statute recites that except as otherwise provided by its terms, pilots "shall be regulated only in conformity with the laws of the States." 46 U.S.C. § 8501(a). But a State may not require "a coastwide [3] vessel" propelled by machinery and subject to Federal inspection "to take a pilot licensed or authorized by the laws of the State ..." § 8501(d). A "coastwise seagoing vessel" is required to be under the control of a federally licensed pilot (that is, *not* a pilot appointed under State authority) if the vessel is "not sailing on register," is underway, and not on the high seas. § 8502(b). That is the statutory division of authority over pilotage summarized by the Supreme Court in *Ray.*

The State of New Jersey exercised its allotted power by providing that "[a]ll masters of foreign vessels and vessels from a foreign port, and all vessels sailing under register ... shall take a licensed pilot." N.J.Stat.Ann. § 12:8–35. It was pursuant to this statute that plaintiff at bar offered his services to the CHERRY VALLEY.[4]

The Merchant Marine Act, 1936, provides that a shipowner receiving a construction-differential subsidy "shall agree that the vessel shall be operated exclusively in foreign trade" or on specified voyages calling primarily at foreign ports. 46 U.S.C.App. § 1156. The statute also provides that no operating-differential subsidy "shall be paid for the operation of any vessel on a voyage on which it engages in coastwise or intercoastal trade ..." § 1175(a). Comparable provisions appear in the subsidy contracts Margate signed with the Government in 1972.

Plaintiff at bar seizes upon this language in the 1936 Act relating to subsidies. He contends that the effect of § 1156 is to make any voyage by a construction-subsidized ship a voyage in foreign trade for pilotage purposes. He contends that Government payment of an operating subsidy on a particular voyage (which concededly occurred here) makes it a voyage in foreign trade, again for pilotage purposes.

I cannot accept these contentions. The statute relating to subsidies has nothing to do with that relating to pilotage. The Congressional purposes bear no meaningful relation to each other. The Merchant Marine Act, 1936, was intended "[t]o make United States vessels competitive in foreign shipping ..." *Atlantic Richfield Co. v. United States,* 774 F.2d 1193, 1196 (D.C.Cir.1985). The readily apparent purpose of the Federal pilotage statute is to ensure safe navigation through pilotage while accommodating overlapping federal and state interests. Considerations pertinent to one purpose do not illuminate the other. That is particularly true of the maritime laws of the United States, which have been described by a House Committee as "a confusing collection of individual statutes enacted over a period of nearly two centuries ... each enacted to solve some particular problem of the day." H.R.Rep. No. 98–338, 98th Cong., 1st Sess.

---

**3.** So in original; the intended word is clearly "coastwise."

**4.** The State of New York has enacted a comparable pilotage statute in respect of "[e]very foreign vessel and every American vessel under register entering or departing from the Port of New York by way of Sandy Hook ..." N.Y.Navig.Law § 88(1) (McKinney 1989). The New York statute

provides that the vessel must take either a New York licensed pilot or one licensed by New Jersey. The Federal pilotage statute provides that the master of a vessel required to take a State pilot may, if navigating waters forming a boundary between two States, employ a pilot licensed by either of them. 46 U.S.C. § 8501(b).

(1983), *reprinted in* 1983 U.S.C.C.A.N. 924, at 113. The problems of foreign flag competition and safe navigation are quite different.[5]

■ The case must be decided, then, by reference to the pilotage statute itself and the regulations propounded by the Coast Guard, the agency charged with the statute's enforcement. We have seen that an American-documented vessel may sail with more than one endorsement on her certificate. In point of fact, the CHERRY VALLEY was documented for both "registry" and "coastwise." Ex. D to Stipulation of Facts. The Coast Guard regulations governing vessel documentation provide: "Where a vessel possesses a certificate of documentation bearing two (2) or more endorsements, the actual use of the vessel determines the license under which it is operating." Note following 46 C.F.R. § 67.17–1.

■ The case for defendant at bar is that the CHERRY VALLEY's challenged voyage from New York to Norfolk in ballast constituted use of the vessel on a coastwise voyage under her coastwise endorsement. If that is conceptually sound, the Federal pilotage statute required a Federal pilot and precluded the services of a State pilot such as plaintiff.

Indeed, that is precisely the view taken by Captain J.F. McGowan of the Coast Guard in a letter dated November 2, 1992 (Ex. F) in response to a written inquiry by Captain Louis Bettinelli, the president of Interport Pilots Agency (Ex. E). Captain McGowan's letter concludes:

> The facts you have presented indicate the M/T CHERRY VALLEY is a U.S. owned and operated, dual-documented vessel that did not stop at any foreign ports during its voyage from New York to Virginia, and was not carrying any foreign cargo, or any domestic cargo for delivery to a foreign port, and that the vessel had no foreign encumbrances. Therefore, this vessel

would be required to sail on its coastwise endorsement for pilotage purposes. As such, the M/T CHERRY VALLEY would have been required to be under the direction and control of a Federally licensed pilot as required by 46 USC 8502.

Captain Bettinelli's economic interest in eliciting that response is apparent. However, Captain McGowan was not advised of the subsidy agreements under which the CHERRY VALLEY had been constructed and was operating. Captain Bettinelli simply told Captain McGowan that the vessel "was sailing in ballast on a coastwise voyage from New York to Norfolk, Virginia." Accordingly, defendant's counsel stretch the facts significantly when they say McGowan's opinion letter "states that the U.S.C.G.'s documentation authority . . . and not the subsidy legislation . . . controls whether a vessel is sailing 'coastwise' or under 'registry' in foreign trade." Main Brief at 7. McGowan's letter says nothing about the effect of the subsidy legislation because he was not told about it. But I am able to arrive at my own conclusion; and I conclude that the subsidy legislation has nothing to do with pilotage.

Plaintiff submits as an appendix to his reply brief a letter sent on June 25, 1991 by Captain F.J. Grady of the Coast Guard to that indefatigable correspondent, Captain Bettinelli.[6] Bettinelli asked the Coast Guard for a ruling on federal versus state pilotage in respect of a voyage by an integrated tug and barge, without cargo, from Baltimore to New York. Bettinelli advised the Coast Guard that the vessel had been built with a cost differential subsidy, and that "these federal subsidies eliminate [the vessel] from eligibility for coastwise trade, and that the vessel is unable to sail under enrollment." The Coast Guard responded:

> "Trade" is not the criteria for determining which endorsement a vessel is employing on a given voyage. If a U.S. inspected,

---

**5.** It is also worth noting that the subsidy statutes do not preclude domestic trade by a subsidized shipowner. The recipient of a construction differential subsidy who uses his vessel in domestic trade does not go to prison. He simply has to repay to the Government a portion of the subsidy, calculated by reference to the proportion that "the gross revenue derived from the domestic

trade bears to the gross revenue derived from the entire voyages completed during the preceding year." 46 U.S.C.App. § 1156.

**6.** This document was not included as an exhibit to the Stipulation of Facts, but defendant does not object to it, and I will consider its contents.

seagoing vessel has only a coastwise endorsement, it is subject to federal pilotage at all times while underway and not on the high seas. This is true even if the vessel is not engaged in trade per se, is sailing in ballast, is shifting from pier to pier or is on a voyage to nowhere. A similar principle applies with respect to a vessel having only a registry endorsement i.e. it is subject to state pilotage jurisdiction at all times. It is important to note that the "trigger" for pilotage is not whether the vessel is "in coastwise trade" or "in foreign trade." Rather, it is whether the vessel is sailing "on register" or "on coastwise endorsement." This is significant because it emphasizes that there should be no gap in pilotage jurisdiction; even though a vessel is not in trade per se, it is still subject to either state or federal jurisdiction.

On the voyage of the M/V FRANCES HAMMER described in your letter, the vessel was not sailing under federal pilotage authority and a federal pilot is not required. The vessel was sailing under state pilotage authority.

It is difficult to see what comfort plaintiff derives from this opinion. The Coast Guard's view is that in respect of pilotage, the endorsement under which the vessel sails decides the issue; and "trade" is not the criterion "for determining which endorsement a vessel is employing on any given voyage." Thus concepts of trade derived from the subsidy statutes are irrelevant. This opinion letter does not deal with a vessel holding two endorsements, as did the CHERRY VALLEY. That subject is dealt with in the note to 46 C.F.R. § 67.17–1, quoted *supra.*

When plaintiff offered his services as a pilot to the CHERRY VALLEY, the vessel's "actual use" consisted of a ballast voyage from one American port to another. The voyage would certainly appear to be a coastwise one. It loses that character only if the subsidy statutes and accompanying regulations operate to transform geographic reality. Plaintiff stresses that the vessel's laden voyage from Wales was designated as a "U.S./Foreign" voyage terminating at Sewell's Point Anchorage on October 1, 1992,

and that the "non-subsidized voyage" did not start until October 2. Those attestations do indeed appear on the itinerary prepared by Margate (Ex. C). It is also the case that the Maritime Administration regulations covering operating-differential subsidy agreements provide that a subsidized voyage terminates, *inter alia,* upon "the completion of final discharge of cargo or ballast at the last U.S. port of discharge ..." 46 C.F.R. § 281.3(b). That explains extension of the CHERRY VALLEY's subsidized voyage through discharge of ballast at Sewell's Point Anchorage. I conclude, however, that definitions of voyages for accounting purposes under an operating-differential subsidy agreement between a shipowner and the Government have no bearing upon the use being made of a vessel with multiple trade endorsements in the context of the documentation and pilotage laws.

Were it otherwise, the carefully crafted boundaries of pilotage jurisdiction, which have been in place for many years, would be disrupted and the issue made to turn, in the case of American flag vessels, upon whether the vessel is subsidized or not. Nothing in the Merchant Marine Act, 1936, or its regulations suggests that Congress intended such a result. I decline to impose it.

For the foregoing reasons, the plaintiff's motion for summary judgment is denied. Defendant's cross-motion is granted. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint with prejudice and statutory costs.

Defendant's request for Rule 11 sanctions is denied. Construction of the several maritime laws involved presented a fair ground for litigation. The Coast Guard letter opinion does not brand plaintiff's suit as objectively unreasonable since full disclosure of the circumstances was not made in the request for the opinion.

It is SO ORDERED.