247 F.3d 1032 (9th Cir. 2001)
 KATIE JOHN; DORIS CHARLES; MENTASTA VILLAGE COUNCIL; ALASKA FEDERATION OF NATIVES, PLAINTIFFS-APPELLEES,
v.
UNITED STATES OF AMERICA; GALE A. NORTON,[1] IN HER OFFICIAL CAPACITY AS SECRETARY OF INTERIOR; ANN M. VENEMAN,[2] IN HER OFFICIAL CAPACITY AS SECRETARY OF AGRICULTURE; AND DANIEL DEMIENTIEFF, NILES CESAR, FRAN CHERRY, ROBERT BARBEE, DAVE ALLEN, AND RICK CABLES, IN THEIR CAPACITIES AS MEMBERS OF THE FEDERAL SUBSISTENCE BOARD, DEFENDANTS-APPELLEES,
AND
STATE OF ALASKA AND FRANK RUE, IN HIS CAPACITY AS COMMISSIONER OF THE ALASKA DEPARTMENT OF FISH AND GAME, DEFENDANTS-APPELLANTS.
 No. 00-35121
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Initial En Banc Hearing Argued and Submitted December 20, 2000
Filed May 7, 2001
 
 Joanne M. Grace, Assistant Attorney General, State of Alaska, Anchorage, Alaska, for the defendants-appellants.
 Heather Kendall Miller, Anchorage, Alaska and William E. Caldwell, Fairbanks, Alaska, for the plaintiffs-appellees.
 Elizabeth Ann Peterson, Department of Justice, Washington, D.C., for the defendants-appellees.
 Rebecca S. Copeland, Koval & Featherly, P.C., Anchorage, Alaska, Steven W. Strack, Deputy Attorney General, Boise, Idaho, Robert S. Pelcyger, Fredericks, Pelcyger & Hester, Llc, Louisville, Colorado, William Perry Pendley, Mountain States Legal Foundation, Denver, Colorado, Howard E. Shapiro, Washington, D.C., David S. Case, P.C., Anchorage, Roberta C. Erwin and Robert C. Erwin, Erwin & Erwin, Anchorage, Alaska, Paul A. Lenzini, Alexandria, Viriginia, and Jerome C. Muys, Washington, D.C., for the amici curiae.
 Appeal from the United States District Court for the District of Alaska H. Russel Holland, Chief Judge, Presiding D.C. No. CV-90-00484-HRH
 Before: Mary M. Schroeder, Chief Judge, Stephen Reinhardt, Alex Kozinski, Diarmuid F. O'Scannlain, Pamela Ann Rymer, Michael Daly Hawkins, A. Wallace Tashima, Susan P. Graber, M. Margaret McKeown, William A. Fletcher, and Richard C. Tallman, Circuit Judges.
 Per Curiam
 Per Curiam Opinion; Concurrence by Judge Reinhardt; Concurrence by Judge Tallman; Dissent by Judge Kozinski; Special Statement by Judge Rymer
 PER CURIAM:
 
 
 1
 Before this en banc court are the district court's opinion and judgment entered pursuant to our court's mandate in Alaska v. Babbitt, 72 F.3d 698 (9th Cir. 1995) (en banc rehearing denied Aug. 8, 1995), cert. denied, 516 U.S. 1036 (1996), 517 U.S. 1187 (1996), and cert. denied sub nom. Alaska Federation of Natives v. United States, 517 U.S. 1187 (1996). A majority of the active judges voted to hear the appeal en banc rather than by a three-judge panel. The en banc court has now reviewed the briefs and heard oral argument on this appeal. A majority of the en banc court has determined that the judgment rendered by the prior panel, and adopted by the district court, should not be disturbed or altered by the en banc court.
 
 
 2
 AFFIRMED.
 
 
 3
 REINHARDT, Circuit Judge, with whom Judge TASHIMA joins, concurring:
 
 
 4
 Courts make mistakes too. Given the volume of the judicial workload these days, the Ninth Circuit makes remarkably few -- indeed, fewer than some in even the judiciary may think. I believe it important to state, however, that in this case, we made an error in granting an initial en banc hearing, a procedure in which we engage infrequently. There was no justification for taking so unusual an action here.
 
 
 5
 The en banc court took this case directly from the district court, thus bypassing our regular three-judge panel hearing process. We ordinarily do this only when there is a direct conflict between two Ninth Circuit opinions and a panel would not be free to follow either. See Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1478-79 (9th Cir. 1987) (en banc). Here, no such conflict was asserted. Nevertheless, we voted on whether to take this appeal en banc without the benefit of a panel opinion or opinions that would, at a minimum, have provided a clear statement of the issues raised. In this case, a panel opinion would likely have emphasized the points raised by Judge Rymer in her separate opinion: that the present appeal asks this court to resolve the precise question we had already decided in the same case, and as to which we had previously declined to grant en banc review. The issue before the panel then would have been whether the law of the case applied, or whether this case falls into one of the exceptions to that doctrine -- and there is nothing presented by the parties that would lead me to believe that an exception would have been applicable. If the panel had determined that law of the case applied, we would then have been able to vote on whether en banc consideration was warranted with the benefit of the panel's analysis of at least two issues: whether the prior panel's opinion was clearly erroneous and whether its result caused a manifest injustice. See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 216 F.3d 764, 787 & n. 43 (9th Cir. 2000) (discussing exceptions to law of the case doctrine). Although those questions would not have been dispositive,[3] at least we would have known far more about the case than we did when we cast our ill-advised en banc votes.
 
 
 6
 Our mistake in deciding to accept this appeal for initial en banc consideration caused eleven judges an inordinate amount of work, including reading 13 briefs totaling 454 pages, ruling before the hearing on various motions, and preparing, reviewing and voting on five separate opinions. All of this produced (understandably) a conclusory per curiam opinion. Under these circumstances, it would be helpful to acknowledge our error and commit ourselves to examine more carefully any future suggestion by a judge (or anyone else) that we hear a case initially en banc.
 
 
 7
 Having said all that, I concur in the per curiam opinion.[4]
 
 
 
 Notes:
 
 
 [1]
 Gale A. Norton is substituted for her predecessor, Bruce E. Babbitt, as Secretary of the Interior.
 
 
 [2]
 Ann M. Veneman is substituted for her predecessor, Daniel Glickman, as Secretary of Agriculture.
 
 
 [3]
 The law of the case would not be dispositive because it does not bind this court sitting en banc. Jeffries v. Wood, 114 F.3d 1484, 1492 (1997) (en banc).
 
 
 [4]
 Judge Tashima also joins in Judge Tallman's concurring opinion.
 
 
 
 8
 TALLMAN, Circuit Judge, with whom Circuit Judges TASHIMA and W. FLETCHER join, concurring in the judgment:
 
 
 9
 The Court today affirms the district court's judgment effectuating the opinion of the majority in Alaska v. Babbitt, 72 F.3d 698 (9th Cir. 1995) ("Katie John I").[1] That decision approved an interpretation of ANILCA that seized on a single, undefined term--"title"--and, as a result, limited ANILCA's protection of subsistence fishing.
 
 
 10
 We write separately because we do not believe Congress intended the reserved water rights doctrine to limit the scope of ANILCA's subsistence priority. The reserved water rights doctrine is mentioned nowhere in the statute, and it is inadequate to achieve the express congressional purpose of protecting and preserving traditional subsistence fishing. We believe that Congress invoked its powers under the Commerce Clause to extend federal protection of traditional subsistence fishing to all navigable waters within the State of Alaska, not just to waters in which the United States has a reserved water right.
 
 
 11
 A. The Commerce Power.
 
 
 12
 When it passed ANILCA, Congress expressly invoked its power under the Commerce Clause to protect traditional subsistence fishing by rural Alaskans. See 16 U.S.C. §§ 3111(4). The Commerce Clause confers upon Congress the "power . . . to regulate commerce . . . among the several states . . . ." U.S. Const. art. I, §§ 8, cl. 3. The power extends to any activity that "exerts a substantial economic effect on interstate commerce." Wickard v. Filburn, 317 U.S. 111, 125 (1942); see also United States v. Lopez, 514 U.S. 549, 559 (1995) ("[T]he proper test requires an analysis of whether the regulated activity `substantially affects' interstate commerce."). "[W]here there is some effect on interstate commerce," Congress has "power under the Commerce Clause to regulate the taking of fish in state waters . . . ." Douglas v. Seacoast Prods., Inc., 431 U.S. 265, 281-82 (1977).
 
 
 13
 It is beyond dispute that taking fish from waters within the State of Alaska substantially affects interstate commerce. The activity supports a $1.2 billion annual industry that comprises nearly 55% of United States seafood production and accounts for approximately 40% of Alaska's international exports.[2]
 
 
 14
 Congress did not relinquish its constitutional authority and confer upon states title to, or exclusive regulatory authority over, fish in navigable waters within state boundaries by enacting the Submerged Lands Act (SLA), 43 U.S.C. §§§§ 1301-1315. Rather, Congress expressly "retain[ed] all its . . . rights in and powers of regulation and control of . . . navigable waters for the constitutional purposes of commerce . . . ." Id. §§ 1314(a); see also United States v. R.B. Rands, 389 U.S. 121, 127 (1967) (concluding that the SLA "left congressional power over commerce . . . precisely where it found [it]"); Alaska v. United States, 754 F.2d 851, 853 n.3 (9th Cir. 1985) (holding that state ownership of submerged lands remains "subject to Congress' paramount power over navigable waters under the Commerce Clause"). The SLA conferred upon states concurrent regulatory authority over navigable waters and the natural resources within them. Barber v. Hawai'i, 42 F.3d 1185, 1190-91 (9th Cir. 1994). Where federal and state regulations conflict, federal authority preempts state authority. See Douglas, 431 U.S. at 286-87.
 
 
 15
 B. ANILCA's Protection of Subsistence Fishing.
 
 
 16
 In ANILCA, Congress invoked its "constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands . . . ." 16 U.S.C. §§ 3111(4). The Property Clause alone is sufficient justification for federal regulation of federal waters. See U.S. Const. art. IV,§§ 3, cl. 2; Utah Div. of State Lands v. United States, 482 U.S. 193, 201 (1987) (observing that the Property Clause grants the United States plenary power to regulate federal lands). Congress's invocation of the Commerce Clause indicates that it intended ANILCA to regulate not just waters over which it traditionally has exercised regulatory authority, but waters over which the State traditionally has exercised regulatory authority as well.
 
 
 17
 Our determination of the breadth and scope of Congress's exercise of its commerce power, like all inquiries of statutory interpretation, begins with and is circumscribed by the statute's text. Richardson v. United States, 526 U.S. 813, 818 (1999); Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). If "the statute, as a whole, clearly expresses Congress' intention," our role is to effectuate that intention. Dunn v. CFTC, 519 U.S. 465, 479 (1997) (emphasis added) (citation omitted); FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 553 (1960).
 
 
 18
 ANILCA, read as a whole, clearly expresses Congress's intent to create a federal regulatory scheme "to protect the resources related to subsistence needs" and "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." 16 U.S.C. §§ 3101(b)-(c); see also id. §§§§ 3111-3114. To that end, Congress mandated that "the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes. " Id. §§ 3114. Congress expressly protected as subsistence uses "the customary and traditional uses by Alaska residents . . . for direct personal or family consumption as food" and for barter in exchange for other subsistence commodities. Id. §§ 3113 (emphasis added).
 
 
 19
 "Customary and traditional" subsistence fishing occurs primarily on navigable waters. Native Village of Quinhagak v. United States, 35 F.3d 388, 393 (9th Cir. 1994) ("Most subsistence fishing (and most of the best fishing) is in the large navigable waterways rather than in the smaller non-navigable tributaries upstream and lakes where fisherman [sic] have access to less fish."). Fishing Alaska's navigable, salmonidbearing waters has sustained Alaska's native populations since time immemorial. Metlakatla Indian Cmty. v. Egan, 369 U.S. 45, 46 (1962) ("Long before the white man came to Alaska, the annual migrations of salmon from the sea into Alaska's rivers to spawn served as a food supply for the natives.") (emphasis added); see also Organized Village of Kake v. Egan, 369 U.S. 60, 66 (1962) ("[F]ishing rights are of vital importance to Indians in Alaska."); Williams v. Babbitt, 115 F.3d 657, 664 (9th Cir. 1997) ("[F]ishing . . . is an integral and time-honored part of native subsistence culture."); United States v. Alexander, 938 F.2d 942, 945 (9th Cir. 1991) ("Many Alaska natives who are not fully part of the modern economy rely on fishing for subsistence. If their right to fish is destroyed, so too is their traditional way of life.").
 
 
 20
 As non-native populations have settled in Alaska's rural expanses, subsistence fishing has also become a mainstay of Alaska's non-native rural residents. Cf. Hoonah Indian Ass'n v. Morrison, 170 F.3d 1223, 1228 (9th Cir. 1999) (holding that ANILCA protects subsistence practices of all rural Alaskans, not just natives).
 
 
 21
 Given the crucial role that navigable waters play in traditional subsistence fishing, it defies common sense to conclude that, when Congress indicated an intent to protect traditional subsistence fishing, it meant only the limited subsistence fishing that occurs in non-navigable waters. Reading the statute to exclude navigable waters frustrates Congress's express purpose of protecting traditional subsistence fishing for all rural Alaskans by establishing subsistence fishing as a priority use of Alaska's natural resources. We must not "interpret federal statutes to negate their own stated purposes." New York State Dep't of Soc. Serv. v. Dublino, 413 U.S. 405, 419-20 (1973). In the absence of clear textual substantiation, and ANILCA contains none, we cannot presume that Congress intended to protect traditional subsistence fishing with one hand, while reducing it to a veritable nullity with the other. See Johnson v. United States R.R. Retirement Bd., 969 F.2d 1082, 1089 (D.C. Cir. 1992) (finding it "unreasonable to conclude that Congress meant to create an entitlement with one hand and snatch it away with the other").
 
 
 22
 Exercises of the commerce power frequently impose federal regulations in fields previously occupied by the states. Such is the case here. Regulation of hunting and fishing is a traditional attribute of state sovereignty. See Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 11 (1928); United States v. Washington, 520 F.2d 676, 684 (9th Cir. 1975) (noting that the "state has initial authority to regulate the taking of fish and game"). In our federalist system of government, when Congress intends to alter the traditional balance of powers between states and the federal government, it must make its intent to do so clear in the statute. See Gregory v. Ashcroft, 501 U.S. 452, 460-61 (1991). A fair reading of ANILCA leaves no doubt that Congress intended to shift regulatory authority over fishing in waters in the State of Alaska to the federal government in order to protect customary and traditional subsistence fishing by rural residents. See 16 U.S.C. §§ 3202(a) (acknowledging that federal oversight of the subsistence priority diminishes "the responsibility and authority of the State of Alaska for management of fish . . .").
 
 
 23
 Although protection of rural subsistence fishing was ANILCA's ascendant objective, Congress was not unconcerned with state sovereignty. The statute provides that, if the State enforces a rural subsistence priority through the exercise of its own sovereignty, Congress will return primary regulatory authority over fishing to state stewardship. See id. §§ 3115(d). Only when the State failed adequately to protect subsistence fishing did the federal government assume authority over navigable waters in Alaska.[3]
 
 
 24
 To summarize, Congress was clear in ANILCA's text that enforcement of the subsistence priority would entail altering the traditional balance of power between the State of Alaska and the federal government. Congress was willing to give the State primary enforcement responsibility so long as the State effectively implemented a rural subsistence priority. But Congress was also clear that, if the State failed in this endeavor, the federal government would step in to protect subsistence fishing as traditionally practiced by rural Alaskans, i.e., not just in ponds and landlocked lakes in Alaska's interior, but also in Alaska's navigable rivers where the vast majority of subsistence fishing has always occurred. We are charged with effectuating the congressional purpose to protect and preserve traditional subsistence fishing in waters in the State of Alaska. We properly discharge this responsibility only by giving ANILCA the breadth and scope sufficient to achieve Congress's express purpose; that is, by holding that ANILCA applies to all navigable waters in the State of Alaska.
 
 
 25
 C. Katie John I.
 
 
 26
 By affirming without discussion the district court's judgment, the Court today implicitly adopts the analysis of the Katie John I majority. That decision found reasonable a federal agency interpretation of ANILCA extending the rural substance priority only to those waters in which the United States has a reserved right. We do not agree either that deference to the agency's interpretation is appropriate or that the agency's interpretation is reasonable.
 
 
 27
 Judicial deference to agency interpretations is normally justified by the agency's expertise in the regulated subject matter. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 651-52 (1990) ("[A]gency expertise is one of the principal justifications behind Chevron deference."). The agency possesses no expertise, however, that qualifies it to determine whether the rural subsistence priority applies to navigable waters. The issue "is a pure question of statutory construction for the courts to decide." INS v. Cardoza-Fonseca, 480 U.S. 421, 446 (1987); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction."). "Because the issue presented is a question of pure law and does not implicate agency expertise in any meaningful way, we need not defer under Chevron . . . ." Magana-Pizano v. INS, 200 F.3d 603, 611 n.11 (9th Cir. 1999).
 
 
 28
 Moreover, since ANILCA's enactment the agency has advocated two inconsistent interpretations of the statute. Initially, the agency insisted that the subsistence priority did not apply to any navigable waters. In Katie John I , however, the agency argued that the subsistence priority applied to navigable waters in which the United States has a reserved water right. The agency offered no explanation for this sudden interpretive change of heart. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is `entitled to considerably less deference' than a consistently held agency view." Cardoza-Fonseca, 480 U.S. at 446 n.30 (quoting Watts v. Alaska, 451 U.S. 259, 273 (1981)); see also Seldovia Native Ass'n, Inc. v. Lujan, 904 F.2d 1335, 1345 (9th Cir. 1990) (noting that when an agency changes its interpretation of a statute without explanation it should be accorded less deference).
 
 
 29
 Interpreting ANILCA is our responsibility. As Chief Justice Marshall observed: "It is emphatically the province and the duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). We should not abdicate this responsibility by deferring to the agency's interpretation of ANILCA.
 
 
 30
 Even if deference to the agency's interpretation of ANILCA were appropriate, we could not endorse as reasonable an interpretation that ignores congressional purpose and focuses myopically on the term "title." The agency's interpretation, which the Court today adopts as its own, forsakes a clear congressional purpose that runs consistently throughout the statute in favor of a single, undefined word. Fixation on this single word in the several-hundred-page statute is inappropriate for several reasons.
 
 
 31
 First, as the Supreme Court has observed, statutory terms must not be interpreted in isolation but, rather, must be interpreted in the context of the whole statute in the manner "most harmonious with its scheme and with the general purposes that Congress manifested." Commissioner v. Engle, 464 U.S. 206, 217 (1984); see also Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. United Auto., Aerospace & Agric. Implement Workers of Am., 523 U.S. 653, 657 (1998); Crandon v. United States, 494 U.S. 152, 158 (1990); United States v. Morton, 467 U.S. 822, 828 (1984). As discussed, infra, it is clear from reading ANILCA as a whole that Congress intended the rural subsistence priority to apply to all navigable waters in Alaska. We cannot endorse an interpretation that forsakes this intent on the basis of a single, undefined term.
 
 
 32
 Second, the Supreme Court has specifically rejected the argument that one may determine the lands and waters to which ANILCA applies by focusing inflexibly on the term "title":
 
 
 33
 Petitioners also assert that the [Outer Continental Shelf] plainly is not "Federal land" because the United States does not claim `title' to the OCS. . . . The United States may not hold "title" to the submerged lands of the OCS, but we hesitate to conclude that the United States does not have "title" to any "interests therein." Certainly, it is not clear that Congress intended to exclude the OCS by defining public lands as "lands, waters, and interests therein" "the title to which is in the United States."
 
 
 34
 Amoco Prod. Co. v. Village of Gambell, Alaska , 480 U.S. 531, 548 n.15 (1987) (internal citations omitted). The Supreme Court observed that, in determining whether ANILCA applied to particular lands, it was required to do more than simply ask whether the United States held title to those lands. We are bound, therefore, to do more than simply ask whether the United States has title to navigable waters. It is our duty to effectuate Congress's intent by reading the term "title" in the context of the statute as a whole and in light of Congress's express purpose.
 
 
 35
 Third, even if our duty were to determine the meaning of "title" in isolation, we interpret such undefined terms not as technical terms of art but rather in accordance with their ordinary or natural meaning in the context in which they arise. See Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995) (holding that an undefined statutory term should be given its natural, ordinary meaning); United States v. Sanchez, 511 U.S. 350, 357-58 (1994) (same); FDIC v. Meyer , 510 U.S. 471, 476 (1994) (same); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) ("The meaning--or ambiguity--of certain words may only become evident when placed in context."); Deal v. United States , 508 U.S. 129, 132 (1993) ("[T]he meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."). The most natural meaning of "title " in this context is "exclusive possession and control." See Black's Law Dictionary 1493 (7th ed. 1999) (defining "title"); The American Heritage Dictionary of the English Language 1881 (3d ed. 1992) (same). The United States has exclusive possession and control of two interests in navigable waters in Alaska, its navigational servitude and its reserved water rights.[4] All navigable waters are therefore "public lands" upon which the rural subsistence priority applies.
 
 
 36
 Fourth, we must interpret congressional enactments "to avoid untenable distinctions and unreasonable results whenever possible." American Tobacco Co. v. Patterson, 456 U.S. 63, 71 (1982). Salmon are blissfully unaware of the technical distinction between waters in which the United States has a reserved water right and waters in which it does not. They neither observe nor obey such legal constructs. Thus, to protect subsistence fishing only in those portions of a body of water in which the United States maintains reserved water rights is not to protect subsistence fishing at all. A commercial fishing operation could take every fish from an unprotected portion of a body of water, leaving no fish in the remainder for subsistence fishing. This is precisely what ANILCA seeks to prevent.
 
 
 37
 Resting as it does on a rigid, technical interpretation of a single word, the agency's interpretation of ANILCA makes "title" the tail that wags the dog. Rather than interpret that term in the context of the statute as a whole, the agency interprets the statute as a whole in the context of that term, turning traditional interpretive canons on their head. By so doing, the agency frustrates Congress's purpose of protecting traditional subsistence fishing. We cannot endorse such an interpretation as reasonable.
 
 
 38
 D. The Dissent.
 
 
 39
 We agree with much of the dissent's analysis. We were recently reminded in Solid Waste Agency v. Army Corps of Engineers, 531 U.S. 159, 121 S. Ct. 675 (2001), that blind deference to an agency's statutory interpretation is inappropriate. We also agree that Congress cannot alter the balance of power between the State of Alaska and the federal government unless it clearly states its intent to do so.[5] The dissent concludes, however, that Congress did not make a clear enough statement and that, as a result, we must interpret ANILCA's rural subsistence priority as applicable only to non-navigable waters. With this conclusion we must respectfully disagree.
 
 
 40
 The dissent asserts that Congress did not clearly state an intent that the rural subsistence priority apply to navigable waters because the United States does not clearly have "title" to navigable waters or to any interest in them. But as we demonstrate above, the clarity of a congressional enactment does not hinge on a single term in isolation; rather, a statute's clarity is determined by interpreting the statute as a whole, keeping Congress's express purpose in mind. We cannot resolve the question of ambiguity by looking at an isolated word, phrase, or even section of a statute. See Brown v. Gardner, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context . . . ."). We must determine whether a statutory provision is ambiguous by looking at the statute as a whole. See Crandon, 494 U.S. at 158 (Courts must interpret statutes in light of "the design of the statute as a whole and [of] its object and policy"); Massachusetts v. Morash, 490 U.S. 107, 115 (1989) (" `[I]n expounding a statute, we [are] not . . . guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' ") (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51 (1987)). When viewed in toto, in light of its express purpose, ANILCA is not ambiguous.
 
 
 41
 The Supreme Court has cautioned repeatedly against interpreting undefined statutory terms in isolation for a reason-- doing so may lead to absurd results. Such is the case with the dissent's interpretation. The dissent insists upon a strict, technical interpretation of the term "title," ignoring the context in which it is used. It then notes, citing Federal Power Commission v. Niagara Mohawk Power Corporation, 347 U.S. 239, 247 n.10 (1954), that the reserved rights doctrine vests in the United States only a usufructuary interest in water, not an ownership interest. But that is not all Niagara Mohawk says. It also says that the United States cannot hold title to a body of water: "Neither sovereign nor subject can acquire anything more than a mere usufructuary right" in a body of water; a sovereign can "never" acquire "the ownership" of a body of water. Id.
 
 
 42
 The dissent's technical interpretation of "title " in isolation thus entangles it in the following syllogism: ANILCA extends only to bodies of water to which the United States, strictly speaking, has title; the United States cannot have title to any body of water; therefore, ANILCA does not extend to any body of water. This is a peculiar result indeed for a statute that expressly applies to waters and has as one of its express purposes protection of subsistence fishing. The dissent's interpretation is simply untenable.
 
 
 43
 The dissent also argues that the fact that the agency once interpreted the statute as excluding all navigable waters indicates that such an interpretation is at the very least plausible and that the statute, being susceptible of two plausible interpretations, is therefore ambiguous. The dissent's analysis suffers from several flaws.
 
 
 44
 First, statutory ambiguity cannot be determined by referring to the parties' interpretations of the statute. Of course their interpretations differ. That is why they are in court. See Bank of America NT & SA v. 203 North Lasalle Street P'ship, 526 U.S. 434, 461 (1999) (Thomas, J., concurring) ("A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong."). Whether a statute is ambiguous is a pure question of law to be determined by the courts, however, not by the parties or by an administrative agency. See Chandris, Inc. v. Latsis, 515 U.S. 347, 369 (1995) (finding that interpretation of statutory terms is a question of law and is therefore the court's duty); Cardoza-Fonseca, 480 U.S. at 446 (holding that courts must decide "pure question[s] of statutory construction").
 
 
 45
 Second, it is not unheard of for a court to find that an agency interpretation is not reasonable. See, e.g., Solid Waste, 121 S. Ct. at 683 (declining to extend Chevron deference to agency interpretation); SEC v. Sloan, 436 U.S. 103, 118 (1978) (same). We have offered several reasons why the agency interpretation in this case is unreasonable. A statute is ambiguous, however, only if it is subject to more than one reasonable interpretation. DeGeorge v. United States Dist. Ct. for the Central Dist. of California, 219 F.3d 930, 939 (9th Cir. 2000). Such is not the case here.
 
 
 46
 Third, and perhaps most important, the dissent's argument reverses the established chronology of Chevron analysis. The dissent looks first to the agency's interpretation and then to whether the language of the statute is ambiguous. Under Chevron, however, a court must first ask if the language of a statute is ambiguous. See Chevron, 467 U.S. at 842. If it is not, that is the end of the matter--the court merely effectuates the unambiguous statute (as we should in this case). The dissent's analysis, which looks first to an agency interpretation and then argues based on that interpretation that the statute is ambiguous, conflicts directly with Chevron.
 
 
 47
 The dissent next argues, citing two prominent commentators and a handful of cases, that Congress may displace state regulation of fishing in Alaska only by way of a "super-strong clear statement." Read carefully, however, neither the commentators nor the cases support the dissent's argument that a super-strong clear statement is required in this case.
 
 
 48
 Professors Eskridge and Frickey astutely observe that the Supreme Court seems to have held that Congress may waive a state's immunity from suit in federal court or interfere with a state's core functions of self-governance only by making a "super-strong clear statement" of its intent to do so. William N. Eskridge, Jr. & Philip P. Frickey, Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking, 45 Vand. L. Rev. 593, 619-25 (1992). They note that each of these attributes of sovereignty derives directly from the Constitution, immunity from the Eleventh Amendment, and self- governance from the Tenth Amendment and the Guarantee Clause. Id. at 623. Professors Eskridge and Frickey do not argue, as the dissent suggests, that any federal statute that establishes federal regulation in an area traditionally controlled by the states requires a super-strong clear statement.
 
 
 49
 The cases cited by the dissent also reflect the limited application of the super-strong clear statement rule. The cases that require a more rigorous application of the clear statement rule involve Eleventh Amendment immunity, see Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985), and state self- governance, see Gregory, 501 U.S. at 460-61 (requiring super-strong clear statement for federal regulation of "a decision of the most fundamental sort for a sovereign[state]," determination of the qualities of the state's highest officers, a determination that "go[es] to the heart of representative government"); Coyle v. Smith, 221 U.S. 559, 565 (1911) (finding establishment of process for selecting location of the seat of state government "essentially and peculiarly state powers" that the federal government may interfere with, if at all, only by way of a super-strong clear statement).
 
 
 50
 The dissent creates the illusion that the more exacting standard referred to as the super-strong clear statement rule applies in this case by mixing cases applying the rule with cases stating that ownership of the land underlying navigable waters is a traditional attribute of sovereignty. See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 284 (1997); Montana v. United States, 450 U.S. 544, 551 (1981); United States v. Oregon, 295 U.S. 1 (1935). None of these cases makes the conceptual leap urged by the dissent, however-- that the super-strong clear statement rule applies to any federal regulation that reaches navigable waters.[6] Rather, in cases involving ownership of the land underlying navigable waters, the Supreme Court has employed the analysis we undertake above, construing a statute in accordance with its express purpose to determine whether Congress clearly intended it to reach such land.
 
 
 51
 In United States v. Alaska, 521 U.S. 1 (1997), for instance, an Executive Order created a national petroleum reserve that encompassed but did not expressly include lands underlying navigable waters. The Court nonetheless concluded that the Order "reflect[ed] a clear intent to include submerged lands within the Reserve," reasoning:
 
 
 52
 In light of the purpose of the Reserve, it is simply not plausible that the Order was intended to exclude submerged lands, and thereby to forfeit ownership of valuable petroleum resources beneath those lands. The importance of submerged lands to the United States' goal of securing a supply of oil distinguishes this case from Montana and Utah Div. of State Lands, where the disputed submerged lands were unnecessary for achieving the federal objectives.
 
 
 53
 Id. at 40-41. Under this analysis, as argued above, ANILCA clearly includes navigable waters because they are essential for achieving the federal objective of preserving traditional and customary subsistence fishing in the State of Alaska.
 
 
 54
 Finally, the dissent asserts that Congress did not clearly state an intent to apply the rural subsistence priority to navigable waters because Congress used the general term "waters" rather than the specific terms "non-navigable waters" and "navigable waters."[7] This assertion conflates two distinct linguistic concepts, generality and ambiguity. "Broad general language is not necessarily ambiguous," however, "when congressional objectives require broad terms." Diamond v. Chakrabarty, 447 U.S. 303, 315 (1980); see also Dellmuth v. Muth, 491 U.S. 223, 233 (1989) (Scalia, J., concurring) (stating that Congress may abrogate state sovereign immunity without explicit reference to that immunity or to the Eleventh Amendment). ANILCA employs broad, inclusive language ("waters") to attain Congress's broad objective ("to protect and provide the opportunity for continued subsistence uses on the public lands").
 
 
 55
 The clear statement rule requires clarity, not specificity. Although "waters" is a general term, it is also a clear one. There is no doubt that the major rivers (and other navigable waters) interfusing Alaska's landscape are waters. There is no doubt that the United States has an interest in these waters. And there is no doubt that Congress's purpose of protecting traditional subsistence fishing would be frustrated if the subsistence priority did not apply to all such waters. When the statute is read as a whole, in light of this purpose, Congress's intent that the subsistence priority apply to all navigable waters is clear.
 
 
 56
 E. Conclusion.
 
 
 57
 We would affirm the decision of the district court on the broader ground that, in a proper exercise of its Commerce Clause powers, Congress clearly established a subsistence priority that applies to all navigable waters in the State of Alaska, not just those waters in which the United States has a reserved water right.
 
 
 
 Notes:
 
 
 [1]
 The question before us today is whether the United States may enforce at the Batzulnetas fishing site the rural subsistence priority established by the Alaska National Interest Lands Conservation Act, 16 U.S.C. §§§§ 3101- 3233 (2000) ["ANILCA"]. The district court determined that it could in reliance on Katie John I. Only the State of Alaska appealed that determination. The plaintiffs did not cross-appeal to challenge the reasoning behind the ruling that upheld enforcement of their fishing rights. We concur in the per curiam opinion's affirmance of the district court's judgment in favor of the plaintiffs, but, as set forth below, we disagree with the reasoning upon which it is based.
 
 
 [2]
 See Alaska Dep't of Fish & Game, Div. of Comm. Fisheries, Year 2000 Budget Overview, available at http://www.cf.adfg.state.ak.us/ geninfo/about/00overvw.pdf. (last visited April 9, 2001).
 
 
 [3]
 In anticipation of ANILCA's enactment, Alaska implemented a rural subsistence priority on all waters within its boundaries. Regulatory authority under ANILCA thus passed directly to the State under §§ 3115(d). The Alaska Supreme Court later held that the regulations implementing that priority violated the state constitution, however, and struck them down. See McDowell v. State, 785 P.2d 1 (Alaska 1989). When state legislative efforts to amend the constitution so that the State could administer ANILCA proved unsuccessful, the United States Secretary of Interior resumed enforcement of ANILCA's preference.
 
 
 [4]
 Katie John I devotes substantial effort to discussing the nature of the federal interests in water. The statute does not require that the United States have an interest of a particular nature, however. It requires only that it have an interest.
 
 
 [5]
 We recognize, however, a factor specific to this case that mitigates the persuasive force of this interpretive canon. The Supreme Court recently declined to apply the presumption that Congress intended not to interfere with state sovereignty "in an area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108 (2000). The United States has exercised since its founding "traditional jurisdiction over waters that were or had been navigable or which could reasonably be made so." Solid Waste, 121 S. Ct. at 683. The United States also has maintained a significant presence in fish and wildlife regulations since Alaska became a state. See Alaska Statehood Act, Pub. L. No. 85-508, §§ 6(e), 72 Stat. 339 (1958); 43 U.S.C. §§§§ 1601-1629a (1971); 1971 U.S.C.C.A.N. 2192, 2247-50 ("[A]ll Native interests in subsistence resource lands can and will be protected by the Secretary [of the Interior] through the withdrawal power.").
 
 
 [6]
 The dissent says we "waffle " regarding whether the clear statement rule applies to ANILCA. See Slip Op. at 1048 n.6. Our position is simple: the clear statement rule applies; the super-strong clear statement rule does not. As we state above, the Supreme Court has applied the super-strong clear statement rule only to federal legislation impinging on states' Eleventh Amendment immunity and core functions of self-governance. See Eskridge & Frickey, supra, at 619-25 (observing that the Supreme Court has "transformed some of the existing clear statement rules into super strong clear statement rules") (emphasis added). ANILCA neither effects a waiver of Alaska's Eleventh Amendment immunity nor imposes restrictions on its core functions of self-governance. Therefore, the clear statement rule, not the super-strong clear statement rule, applies to ANILCA.
 
 
 [7]
 We rejected a similar argument 30 years ago. In United States v. Alaska, 423 F.2d 764 (9th Cir. 1970), the State argued that an Executive Order withdrawing "water" for protection of the giant Kenai moose did not evince a clear intent to withdraw "navigable water." Id. at 767. Noting that, "[i]f the Order failed to withdraw the navigable water in the designated area, it amounted to nothing more than an impotent gesture," we rejected the argument as "patently unsound." Id. The same is true here.
 
 
 
 58
 KOZINSKI, Circuit Judge, with whom Circuit Judges O'SCANNLAIN and RYMER join, dissenting:
 
 
 59
 The Supreme Court has held time and again that states control fishing in their navigable waters, unless Congress has clearly stated a contrary intention. See United States v. Oregon, 295 U.S. 1, 14 (1935); Coyle v. Smith, 221 U.S. 559, 573 (1911); see also Montana v. United States, 450 U.S. 544, 552 (1981). Alaska exercises sovereignty over the beds of its navigable waters just as it does over its dry land; its power to control navigation, fishing and other public uses of the water above the beds is an incident of this sovereignty. See Utah Div. of State Lands v. United States, 482 U.S. 193, 195 (1987). Because control over "navigable waters uniquely implicate[s] sovereign interests," Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 284 (1997), Congress will not be deemed to have taken away such rights by implication or indirection. Rather, Congress must have "definitely declared or otherwise made plain" an intent to diminish the state's right to control fishing and other activities on its navigable waters. Montana, 450 U.S. at 552 (internal quotation marks omitted); see also Gregory v. Ashcroft, 501 U.S. 452, 460-61 (1991).
 
 
 60
 This "super-strong clear statement rule" reflects important structural considerations in the relationship between the states and the federal government.[1] It"assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." United States v. Bass, 404 U.S. 336, 349 (1971). When Congress takes away important incidents of a state's sovereignty, it must speak plainly, not only to show that it has carefully considered the issue, but also to ensure political accountability. Just as Congress must make "unmistakably clear in the language of the statute" its intent to abrogate a state's Eleventh Amendment immunity, see Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985), so too must it make "unmistakably clear" an intent to alter the usual federal-state balance with respect to a "traditional and essential state function." Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 209 (1998); see also Gregory, 501 U.S. at 460-61.
 
 
 61
 Just this term, the Supreme Court reminded us that the clear statement rule applies whenever an interpretation of a statute "would result in a significant impingement of the States' traditional and primary power over land and water use. " Solid Waste Agency v. United States Army Corps of Eng'rs, 121 S. Ct. 675, 684 (2001). In Solid Waste, the Court struck down the Army Corps of Engineers' "Migratory Bird Rule." See 51 Fed. Reg. 41,217 (Nov. 13, 1986) (bureaucratic power-grab over intrastate waters where migratory birds stop to drink). The Clean Water Act defined "navigable waters " as "the waters of the United States, including the territorial seas," 33 U.S.C. §§ 1362(7), a definition that clearly did not include non-navigable, isolated, intrastate waters.[2] Even if the statute were not clear, the Court held, it would reject a construction that encroached upon a traditional state power where Congress had not clearly expressed an intent to do so. See Solid Waste, 121 S. Ct. at 683.
 
 
 62
 As the Supreme Court has thus made plain, in determining whether Congress has made the kind of clear statement required in these circumstances, we must ask whether an interpretation that infringes on a state's sovereignty would be "plain to anyone reading the [statute]. " Gregory, 501 U.S. at 467. Rather than answering this question, the majority declines to "disturb[ ] or alter[ ]" our court's earlier ruling in Alaska v. Babbitt, 72 F.3d 698 (9th Cir. 1995). Maj. Op. at 5628. In Babbitt, we recognized that ANILCA "makes no reference to navigable waters" but nonetheless deferred to the federal agency's "reasonable" interpretation of "public lands." 72 F.3d at 702, 703-04. By adopting Babbitt's judgment, the majority implicitly adopts Babbitt's rationale, which rests upon deference to agency interpretation under Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).
 
 
 63
 Chevron deference has never been very persuasive in this context. An agency's interpretation is entitled to deference only where the statute is ambiguous; in such cases, the agency may resolve the ambiguity in accordance with its best judgment. But Chevron deference carries the day only where the statute is not clear. See INS v. Cardoza-Fonseca, 480 U.S. 421, 447-48 (1984). Chevron and the clear statement rule are, therefore, at loggerheads: If we must rely on the agency to divine the meaning of the statute, the meaning cannot be "plain to anyone reading" it. And, where Congress has not spoken plainly, it cannot be deemed to have abrogated an important incident of a state's sovereignty. Nor are we convinced that this is the kind of decision Congress could delegate to an agency, and certainly not casually. The clear statement rule is "an effort to promote congressional--rather than executive or bureaucratic deliberation . . . and to cabin executive officials by calling for express legislative authorization." Cass R. Sunstein, Law and Administration After Chevron, 90 Colum. L. Rev. 2071, 2114 (1990). Agencies have expertise in particular areas of the law, not in deciding the proper allocation of power between the federal and state governments. For reasons already explained, this is a matter of utmost importance and delicacy, one that must be decided by Congress itself, subject to the normal political accountability such a decision entails. Delegating that authority to an agency of the Executive Branch--to officials well below the level of the President--is an affront to the dignity of the sovereign states. So understood, the clear statement rule "cannot be trumped by Chevron." Id.
 
 
 64
 In any event, Babbitt's deference to the agency's interpretation of ANILCA is now foreclosed by Solid Waste . See 121 S. Ct. at 683 ("[The clear statement] requirement stems from . . . our assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."). Babbitt did just what the Supreme Court said not to do, by deferring to the agency's interpretation of "public lands" despite the absence of a clear statement. Is Solid Waste chopped liver? One would certainly think so from reading what seems to be our court's first en banc memorandum disposition. One can only guess whether a majority believes that the clear statement rule does not apply, despite what the Supreme Court told us in Solid Waste; or that it does apply, but Babbitt's interpretation of ANILCA is "plain to anyone reading the [statute]."
 
 
 65
 In fact, as Babbitt recognized, its interpretation of the statute is far from plain. 72 F.3d at 703-04 (agency's interpretation of "public lands" gives no meaning to the term "title" as used in ANILCA's definition of "public lands, " but it is "reasonable"). ANILCA does not speak of navigable waters at all. And it does not mention reserved water rights or the navigational servitude. ANILCA speaks only of public lands, which it defines as "lands, waters, and interests therein . . . the title to which is in the United States." 16 U.S.C.§§ 3102(1)-(3) (emphasis added).
 
 
 66
 The majority adopts an interpretation of "public lands" that includes those navigable waters where the United States retains reserved water rights. See Maj. Op. at 5628; Babbitt, 72 F.3d at 703-04. The reserved water rights doctrine provides that, where the United States owns lands, it reserves a usufructuary right to waters adjacent to that land, to the extent necessary to carry out the purpose to which that land is devoted. See Cappaert v. United States , 426 U.S. 128, 138-39 (1976). Thus, if a piece of federal grazing land depends on adjacent waters for irrigation, the United States is deemed to have retained the right to take sufficient water to irrigate the land. See Arizona v. California, 373 U.S. 546, 598-99 (1963). But a usufructuary right does not give the United States title to the waters or the lands beneath those waters. See Federal Power Comm'n v. Niagara Mohawk Power Corp. , 347 U.S. 239, 247 n.10 (1954); see also California v. Rank, 293 F.2d 340, 357 (9th Cir. 1961), aff'd in part and rev'd in part on other grounds sub nom. Dugan v. Rank, 372 U.S. 609 (1963).[3]Because ANILCA defines public lands as "lands, waters, and interests" to which the United States holds title, the federal government's reserved water right is simply not sufficient to turn waters subject to that right into public lands.
 
 
 67
 While this seems the most plausible interpretation of ANILCA, it doesn't matter whether the majority agrees. It suffices that it is a plausible interpretation. As the Supreme Court made clear in Solid Waste, the existence of two plausible interpretations, one of which removes an incident of state sovereignty and the other of which does not, requires us to adopt the interpretation that preserves the state's sovereignty. 121 S. Ct. at 183-84; see also Gregory, 501 U.S. at 467 ("[I]n this case we are not looking for a plain statement that judges are excluded. We will not read the ADEA to cover state judges unless Congress has made it clear that judges are included."). Quite aside from the fact that Babbitt only found its interpretation of "public lands" to be reasonable--and not plain--the majority's refusal to offer any analysis in support of its conclusion obviously falls short because it fails to explain why the alternative interpretation, the one that preserves the state's prerogatives, is not also plausible.
 
 
 68
 Judge Tallman reads "public lands" to include all navigable waters by virtue of the federal government's navigational servitude[4] and reserved water rights. See Tallman Concurrence at 5639. He finds this meaning plain because Congress was "clear that . . . the federal government would step in to protect subsistence fishing as traditionally practiced by rural Alaskans." Id. at 5635.[5] But he finds this clarity only by dismissing the statutory language as a technicality. As Judge Tallman sees the matter, in "the absence of clear textual substantiation" that ANILCA does not apply to navigable waters, it would "def[y] common sense" to think the subsistence priority would apply only to non-navigable waters. Id. at 5634. Under Judge Tallman's approach, we must adopt the statutory definition that tramples on state sovereignty unless Congress has clearly stated otherwise. This is the clear statement rule alright--stood on its head.[6]
 
 
 69
 What is plain is that Congress limited the definition of "public lands" to those lands, waters and interests to which the United States holds title. Contrary to the concurrence's suggestion, the ordinary definition of title is the "legal right to control and dispose of property." Black's Law Dictionary 1493 (7th ed. 1999) (emphasis added); compare Tallman Concurrence at 5639 (defining title as "exclusive possession and control").[7] No one suggests that an implied reserved water right or the navigational servitude is a transferable interest: The United States may use waters next to its land to the extent necessary to support the land, and it may exercise regulatory authority over navigable waters, but it does not hold "title" in these "interests" as it would in a leasehold or easement. See City of Angoon v. Hodel, 803 F.2d 1016, 1027 n.6 (9th Cir. 1987) ("[T]he United States does not hold title to the navigational servitude . . . ."); see also Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 548 n.15 (1987) (declining to rule out the possibility that the United States might have "title" to interests in the Outer Continental Shelf); Restatement (First) of Property §§ 450 (1944) (defining easement as "an interest in land in the possession of another"). To say that the United States holds title to an interest in land or water, no matter how ephemeral or inalienable, may sound "natural" to the concurrence, but it eviscerates the meaning of "title."While, for the reasons explained, we do not believe that the interpretation adopted by Judge Tallman is plausible, his concurrence strains credulity when he argues that our interpretation, which relies on the text of the statute rather than statutory penumbras and emanations, is implausible. Aside from the fact that our interpretation relies on the statutory text, we are not the first to adopt this interpretation, as it was initially proffered by the United States. While the United States is not entitled to deference, the fact that the agency charged with implementing the statute initially adopted this interpretation and asserted it in this litigation lends weight to the notion that this interpretation is at least plausible. See New York Tel. Co. v. New York State Dep't of Labor, 440 U.S. 519, 544 n.43 (1979) (agency's contemporaneous interpretation of the NLRA as permitting state unemployment compensation for strikers supported an interpretation of the NLRA as not infringing on state authority to provide such benefits). The concurrence therefore suffers from the same deficiency as the majority (and Babbitt). Having failed to persuasively exclude a plausible interpretation that preserves the state's customary prerogatives, it runs afoul of Solid Waste's clear statement that, where two or more plausible interpretations of the statute exist, we must adopt the one that preserves the state's prerogatives.
 
 
 70
 There is no doubt that Congress meant to create a subsistence priority for rural Alaskans on "public lands." But it is far from clear that Congress intended to take away the state's traditional authority to control fishing in half of the state's navigable waters, as the majority implicitly holds, or in all of the state's navigable waters, as the concurrence would have it. Just as it was "at least ambiguous whether a state judge is an `appointee on the policymaking level,' " it is "at least ambiguous" whether navigable waters are lands, waters or interests to which the United States holds title. Gregory, 501 U.S. at 467. As Judge Hall recognized in Babbitt , a political judgment as monumental as this must be made by Congress itself, and expressed in no uncertain terms. 72 F.3d at 708 (Hall, J., dissenting). The statute does not give fair notice that this is what ANICLA was meant to do. As applied by Judge Tallman, the clear statement rule becomes a euphemism for reading statutory tea leaves. And, as the majority says nothing at all, we can only guess why it chooses to leave in place our highly questionable and clearly discredited opinion in Babbitt. Because we believe the parties in this case, and especially the State of Alaska, deserve better, we respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 William N. Eskridge, Jr. & Philip P. Frickey, Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking, 45 Vand. L. Rev. 593, 619-25 (1992) (describing the Court's "super-strong clear statement rules"). As described by Professors Eskridge and Frickey, the Supreme Court has strengthened the clear statement rule in part because of its constrained review of federal legislation that intrudes on states' regulatory authority: "[I]nasmuch as . . . Garcia [v. San Antonio Metro. Trans. Auth., 469 U.S. 528 (1985)] has left primarily to the political process the protection of the States against intrusive exercises of Congress'[s] Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise." Gregory, 501 U.S. at 464.
 
 
 [2]
 Rather than expressing a desire to allow the Army Corps to assert jurisdiction over ponds and mudflats, Congress had "recognize[d], preserve[d], and protect[ed] the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources . . . ." Solid Waste, 121 S. Ct. at 684 (quoting 33 U.S.C.§§ 1251(b)); cf. 16 U.S.C. §§ 3202(a) ("Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in subchapter II of this chapter, or to amend the Alaska constitution."); id. §§ 3202(b) ("Except as specifically provided otherwise by this Act, nothing in this Act is intended to enlarge or diminish the responsibility and authority of the Secretary over the management of the public lands.").
 
 
 [3]
 Judge Tallman suggests that we must ignore the term "title" as used in the definition of public lands, as did Babbitt , or otherwise become "entangle[d]" in a syllogism where ANILCA does not apply to waters at all. See Tallman Concurrence at 5642. It's true that neither Alaska nor the United States holds title to navigable waters. See Niagara Mohawk, 347 U.S. at 247 n.10 ("[T]he water itself, the corpus of the stream, never becomes or, in the nature of things, can become, the subject of fixed appropriation or exclusive dominion, in the sense that property in the water itself can be acquired, or become the subject of transmission from one to another." (internal quotation marks and emphasis omitted)). But, as the Supreme Court has repeatedly held, where the United States holds title to submerged lands, that title carries with it the right to control the waters flowing over those lands. See Utah Div., 482 U.S. at 195. Thus, the United States does control fishing in certain navigable waters under ANILCA-- those waters flowing over lands to which the United States has title. At the same time, nothing in ANILCA divests Alaska of its sovereign authority over the waters above state-owned riverbeds.
 
 
 [4]
 The navigational servitude permits the federal government to regulate navigable waters in the interests of commerce without compensating interference with private water rights. See United States v. Virginia Elec. & Power Co., 365 U.S. 624, 627-28 (1961). Even if the navigational servitude is a property interest, see Boone v. United States, 944 F.2d 1489, 1494 n.9 (9th Cir. 1991), it is a non-possessory right rather than an interest to which the United States has title. See City of Angoon v. Hodel, 803 F.2d 1016, 1027 n.6 (9th Cir. 1987).
 
 
 [5]
 The concurrence suggests that ANILCA must include navigable waters because Congress clearly intended to create a federal subsistence priority. See Tallman Concurrence at 5645-46. And, according to the concurrence, under United States v. Alaska, 521 U.S. 1 (1997), we need only rely on Congress's "express purpose" in so concluding. But Congress didn't just create a subsistence priority; it told us that the priority would apply only to "public lands," as defined in 16 U.S.C.§§ 3102(1)-(3). United States v. Alaska does not stand for the proposition that we may focus entirely on a statute's purpose and ignore its language, as the concurrence would have it. See Tallman Concurrence at 5645-46. In Alaska, the Supreme Court determined exactly which lands were included within a federal land reservation by relying on the language of an executive order, which it held had been ratified by Congress in the Alaska Statehood Act. 521 U.S. at 44. The order described a boundary following the Arctic coast line, measured along "the ocean side of the sandspits and islands forming the barrier reefs and extending across small lagoons from point to point, where such barrier reefs are not over three miles off shore." Id. at 36 (internal quotation marks omitted). This geographic description "necessarily embraced certain submerged lands --specifically tidelands shoreward of the barrier islands." Id. at 39. The concurrence ignores the Court's focus on the text of the executive order and suggests, instead, that the Court relied solely on the purpose of the reservation in concluding that the reservation included submerged lands. The Court did rely on Congress's purpose in reserving the land, but it ascertained that purpose from the text, and only after concluding that the order's precise geographic terms clearly encompassed submerged lands. See id. at 36-39. Unlike the precise language of Alaska's executive order, which detailed the geographic boundaries of the reservation, the language of ANILCA does not clearly encompass all navigable waters, nor does it clearly express a congressional purpose to do so.
 
 
 [6]
 The concurrence waffles as to the applicability of the clear statement rule, asserting that the clear statement rule applies, but the "super-strong clear statement rule" does not. See Tallman Concurrence at 5644 n.6. But there is no such distinction, nor has the Supreme Court even hinted as much. Compare Solid Waste, 121 S. Ct. at 683-84 (requiring a "clear statement" where Congress intends to "alter[ ] the federal-state framework by permitting federal encroachment upon a traditional state power" (citing Bass, 404 U.S. at 349)), with Gregory, 501 U.S. at 460-61 (requiring a "clear statement" where Congress acts " `[i]n traditionally sensitive areas, such as legislation affecting the federal balance' " (quoting Bass, 404 U.S. at 349)). The only support the concurrence offers for its view that we can both require and not require a clear statement is a law review article describing the Supreme Court's rigorous enforcement of the rule. See Eskridge & Frickey, note 1 supra, at 619-25. That the Supreme Court is serious about applying the clear statement rule, however, suggests only that we should do the same, not that we should infringe on a state's sovereignty in the absence of a clear statement. If Professors Eskridge and Frickey suggested more than that (and we believe they did not), we are bound to follow the Supreme Court's guidance, not that of law professors.
 The concurrence also suggests that the clear statement rule applies here only in a watered-down fashion. See Tallman Concurrence at 5640 n.5 (the clear statement rule applies here with less "persuasive force" than it ordinarily does (citing United States v. Locke, 529 U.S. 89 (2000))). In Locke, the Supreme Court declined to presume that a state's oil tanker regulations were not preempted, because the state had regulated in "an area where the federal interest has been manifest since the beginning of our Republic," namely the area of national and international maritime commerce. 529 U.S. at 98, 108. Here, Congress has legislated in an area traditionally occupied by the states, see Solid Waste , 121. S. Ct. at 684, and the United States hardly has played a similar role in Alaskan fishing as in international maritime commerce. Indeed, once Alaska became a state, the federal government "transferred and conveyed" to Alaska all federal property used to protect Alaskan fisheries. See Alaska Statehood Act, Pub. L. No. 85-508, §§ 6(e), 72 Stat. 339 (1958). And, title to the lands beneath navigable waters, and to the natural resources within such lands and waters, passed to Alaska under the Submerged Lands Act, 43 U.S.C. §§ 1311(a), just as it did to other states upon statehood. See Alaska Statehood Act, §§ 6(m).
 The clear statement rule either applies or doesn't apply; it doesn't apply "less" or "more." Congress must say so clearly when it intends to impinge on a state's primary authority over traditional state functions, because we presume that Congress does not ordinarily intend to alter the balance of power between the federal and state governments. See Solid Waste, 121 S. Ct. at 683-84. But where Congress merely acts in an area, such as international maritime commerce, where it has traditionally played a dominant role, then the federal-state balance of power stays the same and the clear statement rule is not implicated. Here, as the Court told us in Solid Waste, the clear statement rule applies with all its "persuasive force," requiring Congress to state clearly its intent to impinge on Alaska's sovereign authority over its navigable waters.
 
 
 [7]
 The concurrence argues that we rely on "a strict, technical interpretation" of the term "title," rather than the "natural" meaning that it gives to the term. See Tallman Concurrence at 5639, 5641. But the concurrence relies on the same source that we do in defining title, namely Black's Law Dictionary. The only difference is that the concurrence leaves out part of the definition. According to the concurrence, title consists of "exclusive possession and control." But this is only part of how Black's Law Dictionary defines "title": "The union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property; the legal link between a person who owns property and the property itself." Black's Law Dictionary 1493 (7th ed. 1999). Omitting the inconvenient parts of the definition, such as ownership, doesn't seem the most ordinary method of interpretation, and it's far from a plain reading of the term.
 
 
 RYMER, Circuit Judge
 
 71
 I write separately because Alaska has had two bites at the same apple, and this troubles me. In 1994 the district court certified two controlling questions of law for interlocutory review under 28 U.S.C. §§ 1292(b), one of which was "Does the term `public lands' as defined in Title VIII of ANILCA, 16 U.S.C. §§ 3101(3) include navigable waters within the State of Alaska?" Alaska filed an interlocutory appeal and we entertained it. We resolved the certified question affirmatively in 1995, although we disagreed with the theory upon which the district court proposed to decide which navigable waters constitute public lands (navigational servitude) and held instead that public lands extend to navigable waters on which the United States reserved a water right. We declined to take the panel decision en banc, and the Supreme Court denied certiorari. Our prior decision was, in every sense that matters, a final judgment. Although a new regulatory structure was put in place to implement our decision, see 64 Fed. Reg. 1276 (Jan. 8, 1999), nothing substantive happened in the district court on remand. (There is no challenge here, nor was there in the district court, having to do with the new 1999 regulations.) The district court simply entered judgment adopting our panel decision. Nevertheless, Alaska again appealed, this time in 2000 from the final judgment, raising precisely the same issue on this appeal as we heard and determined on the last one. Indeed, Alaska's brief frames the issue as whether the prior panel got it right.
 
 
 72
 This bothers me, for the only reason to take a §§ 1292(b) interlocutory appeal is to facilitate disposition of the action by getting a final decision on a controlling legal issue sooner rather than later. The point is to save the courts and the litigants unnecessary trouble and expense. Neither will have happened in this case. Parties normally do not get two bites at the apple. However, no one has argued that Alaska should be precluded from doing so here. As preclusion principles are not jurisdictional, I will, reluctantly, reach the merits.